STATE OF MAINE
PENOBSCOT, SS.

FILED & ENTERED
SUPERIOR COURT

MAY 3 0 2003

PENOBSCOT COUNTY

SUPERIOR COURT
CIVIL ACTION
Docket No. CV-00-65
JLH - PEN - 5/30/~~~

In re: Valuation of Common
Stock of Penobscot Shoe Company

Decision and Judgment

DONALD L. GARBRECHT
LAW LIBRARY

JUN 25 2003

Penobscot Shoe Company (PSC) was a Maine-based corporation that was founded in 1935 and that became publicly traded on the American Stock Exchange in 1965. On January 18, 1999, all of its outstanding shares were acquired by PSC Acquisition Corporation, which was an entity created by Reidman Corporation. PSC Acquisition Corporation either paid or offered to pay PSC's shareholders the amount of $11.75 per share. Three of those shareholders – Joseph Nerges, Robert McCullough, and Anne Buta (the dissenters) -- declined to accept that tender offer. After satisfying the procedural predicates necessary to preserve their rights as dissenting shareholders, PSC commenced this action pursuant to 13-A M.R.S.A. § 909(9) to allow the court to determine the "fair value" of the shares held by the dissenters. *See* 13-A M.R.S.A. § 909(9)(E). Trial in this matter was held over the course of ten days in December 2002 and January 2003. On each trial date, counsel for PSC, counsel for the dissenters and dissenter Joseph Nerges were present. Dissenter Robert McCullough and a representative of the ultimate acquiring corporation, Phoenix Footwear Company, were present for a portion of the trial proceedings. Following the completion of the presentation of evidence, the parties filed a series of written argument. The court has considered the parties' post-trial written submissions in association with the evidence itself.

The court also again commends counsel for presenting this extraordinarily dense and factually rich case in a highly organized and efficient manner.

### A. "Fair value" and the burden of proof

Title 13-A M.R.S.A. § 909(9)(E) provides that where a dissenting shareholder establishes entitlement to payment for shares, "[t]he court shall then proceed to fix the

1

fair value of the shares." Although the notion of "fair value" is not defined statutorily, it has been examined by the Law Court in at least two cases, and courts of other jurisdictions have also considered the matter, although under statutes that often vary from Maine's to at least some degree.

A succinct definition of "fair value" is found in *In re Valuation of Common Stock of Libby, McNeill & Libby*, 406 A.2d 54, 62 (Me. 1979):

> The fair value of shares is to be determined on the basis of what a reasonable and prudent observer would consider to be a price that reflects the intrinsic value of the right of stock ownership, without regard to any subjective mental processes of the dissenting shareholders or any special benefit to be derived by the acquiring corporation.

*See also In re Valuation of Common Stock of McLoon Oil Co.*, 565 A.2d 997, 1003 (Me. 1989) ("'The basic concept of value under the appraisal statute is that the stockholder is entitled to what has been taken from him, viz., his proportionate interest in a going concern.'" (*Quoting Weinberger v. UOP, Inc.*, 457 A.2d 701, 713 (Del. 1983) (emphasis deleted)). *See also Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 940 (Del. 1985) (". . .the minority shareholder shall receive the substantial equivalent in value of what he had before."). The *McLoon* Court elaborated on this concept, holding that "[t]he question for the court becomes direct and simple: What is the best price a single buyer could reasonably be expected to pay for the firm as an entirety?" 565 A.2d at 1004. As is noted below, however, this formulation is not to be confused with the market value of the corporation because, taken by itself, a business' market value may not accurately reflect its fair, intrinsic value. *Libby*, 406 A.2d at 61 n.8. Nonetheless, although the legal notion of fair value is distinct from fair *market* value, "'fair value' is still obtained by considering the behavior of market forces." *Steiner Corp. v. Benninghoff*, 5 F.Supp.2d 1117, 1125 (D.Nev. 1996).

The method by which a shareholder's interest is appraised evolved between the Law Court's opinions in *Libby* and *McLoon*. The earlier case, *Libby*, accepted the "Delaware block" method of business appraisal. While recognizing that the precise process was a function of the particular circumstances of the subject corporation, the Court required consideration of a corporation's "stock market price, investment value, and net asset value." 406 A.2d at 59-60. The appraiser must then determine the relative

2

degrees of weight to be assigned to the results of those three separate analyses. *Id.* at 60, 61. This comparative approach does not foreclose the appraiser from concluding that one or more of those results is not worthy of weight; nonetheless, each of the three conclusions must at least be considered. *Id.* at 60; *McLoon*, 565 A.2d at 1002. The appraiser then quantifies the relative strengths and weaknesses of the three elements through a "weighting scheme which, in his judgment, would best reflect the 'fair value' of the dissenters' shares. *Libby*, 406 A.2d at 61. The weights are represented by a proportion in relation to 100%, which is also the sum of the weights assigned to the three elements. *Id.* The Law Court has recognized that this weighting process is more "artistic" than "scientific" and is not susceptible to a "precise mathematical formula." *Id.* The court will briefly note these three valuation concepts identified in *Libby*, subject to further elaboration in the subsequent discussion of these valuation methods as applied in this particular case.

First, the stock market price of a publicly traded corporation gains significance in the valuation of the business when the corporate shares are traded in "a free and open market, characterized by a substantial volume of transactions that makes the market a fair reflection of the judgment of the investing public. . . ." *Libby*, 406 A.2d at 63. On the other hand, if the corporation's trading market is thin (that is, of a low volume) or where ownership of the stock is not widely dispersed, then the fair value of the corporation may not be accurately reflected in its stock price due to those transactional limitation. *Id.* at 64.

As the second of the *Libby* valuation models, "[t]he determination of investment value represents an estimate of the corporation's earning capacity." *Libby*, 406 A.2d at 65. As a general matter, a corporation's investment value is "central" to the appraisal analysis because a corporation's assets are most often valued for their capacity to deliver a future stream of earnings. *Id.* at 66. A corporation's investment value is determined by establishing its "average annual earning figure" based on its recent earnings history. *Id.* at 65. There is no fixed amount of time that must be considered in order to determine an average annual earning. However, it must be of sufficient duration "'to show the settled condition of things.'" *Id.* at 65 n.11 (*quoting* DEWING, THE FINANCIAL POLICY OF CORPORATIONS 376 (1953)). This figure is used as "a predictor of future earnings," *id.*

at 65, and has been characterized as "a representative annual earnings figure. . . ." *In re Jones & Laughlin Steel Corp.* 477 A.2d 527, 535 (Pa.Super. 1984). Therefore, in determining the average annual earnings, the appraiser must exercise "subjective judgment in excluding from consideration those gains and losses that are viewed as 'extraordinary' (*i.e.*, gains and losses stemming from transactions not expected to recur)," *Libby*, 406 A.2d. at 65, or that have no bearing on the corporation's "normal business operations." *Id.* at 68. In other words, with evidence of events that are not reflective of future gains and losses, those events should be excluded from consideration in order to avoid a forecast that is artificially affected by them.

After the corporation's average annual earnings have been found, then the investment value can be calculated by multiplying that earning figure by a capitalization ratio, or earnings multiplier, which takes into consideration the ongoing nature of a future investment. The function of the capitalization ratio, as part of the investment value analysis, is to account for "the stability and predictability of earnings of the particular corporation." *Jones & Laughlin Steel*, 477 A.2d at 535. A lower capitalization rate is associated with a riskier investment and therefore a lower investment value. *See Libby*, 406 A.2d at 66 (examining capitalization ratios of the subject corporation with the higher ratios assigned to stronger and more stable comparable corporations); *see generally* 13 CAVITCH BUSINESS ORGANIZATIONS § 169.07[3] at 169-29 (2002) (discussing price/earnings ratio).

The third and final valuation method identified in *Libby* is an assessment of a corporation's net asset value, which is equivalent to the net value of the corporate assets, both tangible and intangible. *Libby*, 406 A.2d at 66, 69. Typically, net asset value is of secondary importance in assessing a corporation's fair value, because its asset value often does not have a meaningful relationship to its earning power, which in turn is the more common interest of investors. *Id.* at 66. If a corporation is valued in anticipation of liquidation, then clearly its net asset value is of greater significance because those assets would constituted the source of an investor's return. *Id.* Otherwise, "[i]nvestors and speculators. . .have gradually come to give the asset-value factor practically no weight." *Id., quoting Gibbons v. Schenley Industries, Inc.*, 339 A.2d 460, 473 (Del.Ch. 1975). To the extent that a corporation's net asset value has meaning in the appraisal of the

concern's fair value, the actual fair value of those assets – as opposed to a book value, which is derived after consideration of depreciation – must be used. *Libby*, 406 A.2d at 66-67.

Ten years after it issued its decision in *Libby*, the Law Court revisited the corporation appraisal process set out in section 909. In light of intervening developments in the law, the Court took the opportunity to make clear that the three appraisal methods that constitute the Delaware block analysis are not comprehensive. Rather, the appraiser is permitted to consider "and use any other generally accepted and admissible valuation techniques." *McLoon*, 565 A.2d at 1003. ". . .[T]he value of the business entity as a whole should be determined by the best available valuation method." *Id.* at 1004.[1] Thus, the "orthodoxy" was removed from the valuation exercise. *Citron v. E.I. DuPont de Nemours & Co.*, 584 A.2d 490, 508 (Del. 1990). The Delaware Supreme Court in *Weinberger*, on which the Law Court placed heavy reliance in *McLoon*, identified some of those other factors that exceed the conventional Delaware block analysis. Those factors include "earning prospects [and] the nature of the enterprise." 457 A.2d at 713.

In these Maine two cases, the Law Court has also noted factors that may *not* be properly considered in assessing the fair value of a dissenter's shares. First, a dissenting shareholder's minority interest in a corporation cannot be discounted due to the accompanying lack of control over corporate matters. *McLoon*, 565 A.2d at 1004-05. If the value of a dissenter's interest were reduced in this way and the shares were treated as a commodity, the dissenter could not recover full value and instead would be penalized at the expense of the majority shareholders. *Id.* at 1005. Instead, the fair value of the dissenter's shares must be calculated as a percentage of ownership of the entire firm after the value of the firm as a whole is established. *Id.* at 1004-05.

---

[1] The analysis in *McLoon* rests heavily on the Delaware case of *Weinberger*, in which the Supreme Court of Delaware rejected a valuation method that is limited to the three Delaware block method and opened the appraisal process to any relevant and admissible valuation technique. 457 A.2d at 713. The controlling Delaware statute, however, is different than 13-A M.R.S.A. § 909(9)(E), because the former expressly requires the court to "take into account all relevant factors. . . ." Del. Code Ann., tit. 8, § 262(h). Section 909(9)(E) is not as expansive. Nonetheless, the Law Court has adopted the Delaware courts' approach as set out in *Weinberger*.

Second, the valuation analysis is an objective and open one. It therefore cannot rest on considerations relating to "the subjective mental processes of the dissenting shareholders or any special benefits to be derived by the acquiring corporation." *Libby*, 406 A.2d at 62. However, if the losses sustained by the dissenters or the gains enjoyed by the acquiring corporation are revealed "in the price that would be bargained out in a completely free market between *any* willing buyer and *any* willing seller in the absence of the merger" then they may be considered. *Id.*

In assessing the fair value of corporate shares, the tender offer price may have significance in some circumstances. *Libby*, 406 A.2d at 58, n.3. A tender offer price is known to include a premium in excess of the stock market price in order to motivate shareholders to act in redeeming their shares. In that circumstance, the tender offer price may be higher than the fair value of the shares; there, the dissenters are not entitled to the tender offer price as a "floor." *Id.* However, if the merger price results from an arms-length negotiation and is free of collusion, it "is a very strong indication of fair value." *M.P.M. Enterprises, Inc. v. Gilbert*, 731 A.2d 790, 797 (Del. 1999). As the *Libby* Court also noted, any reliance on the tender offer price must be sensitive to the possibility that that price could represent "just the value of the company to one specific value." *Id.*

The controlling date on which the fair value is determined is the date immediately prior to the merger. Here, because PSC approved its acquisition by PSC Acquisition Corporation on January 18, 2000, the court must appraise the fair value of the dissenters' shares as of the previous day (the last day of PSC's independent existence), January 17, 2000.

Further, the appraisal of the dissenters' shares must be determined on the basis of information and data "which are known or susceptible of proof as of the date of the merger. . . ." *Weinberger*, 457 A.2d at 714. Here, the dissenters contend that the valuation of their shares may properly rest on the circumstances of PSC that existed on or prior to the valuation date (January 17, 2000), even if information disclosing those circumstances was not available until a later date. This position, however, is contrary to law that is well established at least in Delaware. The dissenters' argument is also undermined by the nature of the valuation inquiry. Ultimately, the determination of value is predicated on a market or transactional concept: what is the highest price a willing

6

buyer would pay to a willing seller for the entire corporation? *See McLoon*, 565 A.2d at 1004; *Libby*, 406 A.2d at 62.

For the reasons noted above, the actual market price (namely, the stock market price of a publicly traded corporation) is not dispositive because the characteristics of the relevant market may inhibit its participants from arriving at the fair or intrinsic value of the concern. However, other valuation methods ultimately are framed in terms of the ultimate inquiry identified in Maine by *McLoon* and *Libby*. Thus, for example, under the investment valuation method, in the end one must ask how much an investor would be willing to pay in order to gain the right to benefit from a stream of future income while tolerating the risks created by the uncertainty of future expectations. Consequently, the fair value of a corporation (or a proportionate ownership interest of that concern) *as of a specific date* necessarily rests on information that is available to the hypothetical willing buyer on that specific date. If information is unavailable until some time subsequent to the valuation date, then as of the valuation date a knowledgeable and informed buyer could not consider that information in assessing the maximum price he or she would be willing to pay for the corporation as a whole. Here, there is no claim that PSC itself or any of the entities involved in the PSC acquisition concealed information or otherwise prevented the disclosure of relevant valuation data. Thus, for these reasons and under the precedent of *Weinberger* and a well-established line of Delaware cases that includes the seminal case of *Tri-Continental Corp. v. Battye*, 74 A.2d 71, 72 (Del. 1950),[2] the court disregards those portions of valuation opinions that rely on information that was not available as of the valuation date.

Maine legal authority has not addressed the allocation of the burden of proof in valuation cases such as the one at bar. With respect to the statute, PSC's arguments to the contrary, the court cannot conclude that the terms of section 909(9)(E) impose the burden of proving fair value on the dissenting shareholders. By its plain terms, *see Brent*

---

[2] In *Tri-Continental*, the Delaware Supreme Court held that "market value, asset value, dividends, earning prospects, the nature of the enterprise and any other facts *which were known or which could be ascertained as of the date of merger* and which throw any light on future prospects of the merged corporation are not only pertinent to an inquiry as to the value of the dissenting shareholders' interest, but must be considered by the agency fixing the value." 74 A.2d at 72 (emphasis added).

*Leasing Co., Inc. v. State Tax Assessor*, 2001 ME 90, ¶ 6, 773 A.2d 457, 459 (when construing a statute, the court first looks to the plain meaning of the statutory language), the statute requires the dissenters to establish that they have satisfied the procedural predicates to seek relief in the courts. Here, PSC has stipulated that the dissenters have done so. Section 909(9)(E) goes on to provide, "The court shall *then* proceed to fix the fair value of the shares." (Emphasis added.) The plain language of the statute distinguishes between the initial procedural burden that the dissenters must carry, and then the substantive process by which the court assesses the fair value of their shares. The valuation process required by the statute is set out in decidedly neutral terms: it is framed with reference to the appraiser's responsibility and not to the burdens that a party may have in a trial setting.[3]

Under Delaware law, a court examines evidence of the fair value of corporate shares as part of its assessment of all aspects of an acquisition or merger transaction. Thus, the inquiry covers not only the price but also the transaction itself, and those examinations are unified (although a review of caselaw suggests that in practice, those two issues are examined separately as part of the overall consideration of the transaction's entire fairness).[4] *Kahn v. Lynch Communications Systems*, 669 A.2d 79, 84

---

[3] Neither *Libby* nor *McLoon* make any reference to the allocation of the burden of proof. Appellate decisions in other jurisdictions typically are expressly vague about those burden issues, even in the context of challenges to the sufficiency of the evidence. *See, e.g., Bell v. Kirby Lumber Corp.* 413 A.2d 137, 143 (Del. 1980) ("It is thus apparent that no rule of thumb is applicable to weighting; rather, the rule becomes one of entire fairness and sound reasoning in the application of traditional standard and settled Delaware law to the particular facts of each case."); *Piedmonte v. New Boston Garden Corp.*, 387 N.E.2d 1145, 1153 (Mass. 1979) (without referring to a burden of proof, Massachusetts Supreme Judicial Court concludes that weightings by trial court were "reasonable" and within its discretion).

[4] The Delaware courts have characterized these two elements as "fair dealing and fair price." *Weinberger*, 457 A.2d at 711. The former rests of notions of "when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." *Id.* In the case at bar, the dissenters have not made arguments to challenge the fairness of the merger process. *See, e.g., Citron*, 584 A.2d at 504-05 (examples and analysis of claims of unfair dealing). Rather, the dissenters contend that the merger price did not reflect the fair value of PSC. This is an inquiry that, from the Delaware perspective, considers "the economic and financial considerations of the proposed merger, including all relevant

(Del. 1995). However, when the court "address[es] the fair price aspect of the merger transaction," *id.* at 86, the assessment of the evidence is governed by shifting burdens of proof. Initially, the party defending the merger (tender offer) price must demonstrate its fairness. *Id.* at 88. Upon "a sufficient showing of fair value of the company. . ., the party attacking the merger was required to come forward with sufficient credible evidence to persuade the finder of fact of the merit of a greater figure proposed." *Id.* The preliminary, "sufficient" showing that the proponent of the tender offer price must make is a *prima facie* case. *Citron,* 584 A.2d at 508, *quoted in Kahn,* 669 A.2d at 88.[5]

The nature of the substantive issues presented in *Kahn* and *Citron* make clear that the burden analyses found in those cases is appropriate here. In both of those Delaware cases, the dissenting shareholders raised claims regarding both aspects of the entire fairness question: fair dealing and fair price. Further, both of those cases involved a parent-subsidiary acquisition. Because of these circumstances, there is heightened sensitivity to the rights and interests of shareholders, and the legal framework governing the examination of such cases reflects that concern. In *Citron,* the acquiring corporation (DuPont) was the majority shareholder of the target entity (Remington). Under Delaware law, the entire fairness of the transaction was at issue. 584 A.2d at 500. Ordinarily when the acquiring corporation is a majority or controlling shareholder of the target corporation, the corporation bears the burden of establishing that entire fairness. 584 A.2d at 500. However, due to particular circumstances that mitigated the problematic effects inherent in a parent-subsidiary acquisition, the burden of proving unfair dealing was placed with the dissenters. *Id.* at 502. *See also Rosenblatt v. Getty Oil Co.,* 493 A.2d 929, 937 (Del. 1985). Nonetheless, despite those mitigating factors that had the effect of handing to the dissenters the burden of proof on a major issue, the corporation

---

factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock." *Id.* Because this is precisely the issue presented for resolution, it is appropriate to draw on the burden of proof framework established in Delaware when its courts consider such a claim.

[5] The trial court in *Citron* framed its conclusion in the following terms: "The defendants' [corporations'] valuation evidence persuades me that it was [fair]. The plaintiff's [dissenter's] contrary evidence is unpersuasive and insufficient to discharge her burden of proving that the merger price was unfair." 584 A.2d at 505. Thus, the trial court imposed burdens on both the corporation and the dissenting shareholder.

retained the burden of making a *prima facie* case that the merger or tender offer price was fair. 584 A.2d at 505; *see* note 5 *supra*. Further, despite the basic circumstances that triggered additional protections for the dissenters, those dissenters were still required to carry a burden of rebutting the corporation's valuation evidence. *Id.* at 505; *see* note 5 *supra*.

The contrast between *Citron* and *Kahn* is useful. In the latter, there did not exist the mitigating factors that, in the former, required the dissenters to prove unfair dealing. Rather, in *Kahn*, the corporation retained the burden of demonstrating that the merger was the result of a fair transactional process. Even under that circumstance, which was more favorable to the dissenter than in *Citron* (where mitigating factors operated to shift the burden on transactional fairness to the shareholder) and in the case at bar (where the fair dealing issue has not been raised), the court still looked to the shareholder to satisfy a burden of rebutting the corporation's evidence on fair value.

Therefore, a review of caselaw from the influential Delaware jurisprudence reveals that where a corporation presents a prima facie case that the tender offer price represented the fair value of the target corporation, the dissenting shareholders must shoulder the burden of rebutting that valuation evidence.

The court does not construe these cases to suggest that a corporation bears no burdens on valuation in those cases where dissenters do not allege that the transaction was infected by unfair dealing (that is, where there is no claim that the transactional process was flawed due to culpable conduct or other factors). The cases simply do not support that position, and PSC has not presented any separate authority to that effect.

Therefore, here the court adopts the procedural framework developed by the Delaware courts. In construing Maine's dissenting shareholder statutes, the Law Court has freely drawn on the Delaware models of valuation analysis and has even integrated new approaches as they have developed in the Delaware courts, as is demonstrated by the Law Court's treatment of *Weinberger*. The body of generally relevant law that has evolved in Delaware is quite developed, and the parties at bar have drawn freely on that

10

law. The court finds it appropriate to adopt the approach of the Delaware courts in examining the parties' evidence of corporation valuation.[6]

This approach is not inconsistent with that suggested in *Cavalier Oil Corp. v. Harnett*, 1988 Del.Ch. LEXIS 28, at *64 (Feb. 22, 1988), *aff'd*, 564 A.2d 1137 (Del. 1989). Construing its function under the Delaware statute that provides that the court "shall appraise" the fair value of the dissenter's shares, the trial court there found that even where the parties have failed to determine a value (that is, even when the parties have failed to prove something), the court must make a finding of value nonetheless. Except in extraordinary cases, corporate share have *some* value, and the court must assess that value. That appraisal can only be conducted on the basis of the evidence presented by the parties to the dispute, and the affirmative application of a burden structure, such as that identified in *Kahn*, is the conventional and orderly approach to that task. Perhaps in an unusual case where the court is completely dissatisfied with the analysis presented by the parties at bar, the default analysis suggested in *Cavalier Oil* would be warranted. That, however, is not the situation here.

## B. Historical background (evolution of PSC and development of merger)

PSC was founded in 1935 by Philip Lown and Max Kagan, who both were experienced in the shoe industry. The business was located in Old Town. The company specialized in the production of moccasins and loafers, and it incorporated the talents and heritage of members of the nearby Penobscot community. In the 1940's, PSC developed a product line that ultimately became known as Trotters. Trotters, in their essence, were moccasins with integrated fashion features. These shoes were sold nationally, including at prominent retail stores. Through the mid 1960's, PSC grew. In 1964, its gross sales

---

[6] It should be noted that another framework for burdens of proof has been suggested in secondary authority. *See* AMERICAN LAW INSTITUTE, PRINCIPLES OF CORPORATE GOVERNANCE: ANALYSIS AND RECOMMENDATIONS § 7.22(b) (1994). There, in an arms-length acquisition or merger, a board's decision to accept a tender offer presumptively demonstrates that the offer amounts to fair value. Any dissenting shareholders then have the burden of establishing by clear and convincing evidence that the fair value is different from the terms embodied in the tender offer. The court's research did not reveal any actual caselaw adopting or mirroring this procedural approach, and none of the parties has proposed or advocated it here. Instead, the court accepts the burden allocation established in Delaware law, which the Law Court generally has found to be persuasive.

11

were $13.5 million, and the company was profitable (its net income exceeded $900,000). The next year, PSC was converted to a publicly held and traded corporation. It eventually was sold on the American Stock Exchange. Through 1968, its sales continued to increase and exceeded $22 million that year, with net profits of nearly $1.4 million.

Max Kagan died in 1969. For the thirty years following his death, PSC experienced a cyclical pattern of relative highs and lows. During that period of time, its annual gross sales fluctuated between $12 million and $22 million. Due to fundamental changes in the shoe industry, in 1971 PSC acquired a foreign importer and began to import shoes. Despite this, PSC continued its domestic manufacturing operations for two more years. However, the company suffered losses in three consecutive years beginning in 1971.

In 1973, the remaining founder, Lown, wanted to retire. PSC agreed to permit Lown to redeem his PSC shares but that redemption was to be preceded by an extension of the identical offer to all other corporate shareholders. In that way, shareholders not as closely associated with PSC would have the first opportunity to take advantage of the same benefit that might be extended to Lown. Then, if sufficient funds remained for PSC to acquire Lown's interest, it would do so – and it did do so. Nearly one-third of PSC's shares were involved cumulatively in these transactions.

With Lown's retirement, Max Kagan's son, Irving Kagan, became board chair and CEO. He had been president of the company since his father's death in 1968, although in reality, by force of personality, Lown appears to have carried out many of the responsibilities associated with that position. When Kagan acquired additional management responsibility and authority in 1974, PSC began a limited course of increasing sales and profitability. It developed a private label business (in which its shoes, given a modified appearance, were sold under another label, mostly by large retailers), and it closed the import subsidiary. By 1980, PSC's gross sales had returned to a level of $22 million, comparable to its sales in the late 1960's, and its net earnings were $1.7 million, also comparable to the earlier period of relative success.

However, substantial increases in the domestic sale of imported shoes caused PSC to have renewed financial troubles. By 1984, PSC's gross revenues had fallen to nearly half of its 1980 level, $12 million, and its net income was $360,000 – twenty percent of

12

its 1980 net earnings. However, with further changes in its strategy (most notably, purchasing shoe components from foreign manufacturers, using its domestic facility only for assembling those pieces, and by terminating its private label production), by 1988, PSC had swung back to a stronger condition: $18 million in gross sales, and $1.3 million net earnings. During that time of resurgence, PSC placed distribution emphasis on independent retailers, as opposed to the larger retailers (mostly department stores) who were increasingly drawn toward imported shoes. However, those independent stores began to play a diminishing role in the overall retail market, and PSC suffered from that phenomenon because of its reliance of them. Consequently, because of that and because of changes in fashion trends, PSC again experienced a downturn and suffered a three year period of consecutive annual losses between 1989 and 1991. The next year, 1992, brought flat sales levels. In 1993, PSC commissioned an outside entity to conduct an assessment of its options. In fact, as part of that process, PSC had some contact with Advest, which was given the investment banker role in the acquisition at issue here. With alternatives of liquidation or sale to a third party, PSC chose to continue as an independent concern. Kagan retired that year from his day-to-day management responsibilities, although he continued as a member of the board.

Sales figures though the mid 1990's remained as low as they had been in recent times (roughly $12 million in gross sales). Its annual net earnings were less than $250,000. In 1996, PSC developed a three year recovery plan and in fact met its modest earnings goal the first of those years, when its gross earnings increased by roughly 20%. In 1997, however, PSC fell far short of its target despite the best efforts of PSC personnel. The goal for 1997 was then substituted as the 1998 goal.

As of 1998, Kagan and his sister collectively owned in excess of 54% of PSC's outstanding shares. Kagan approached the board of directors in mid-1998 and expressed an interest in redeeming his shares of the corporation. The board agreed to consider the option of selling the company to a third party. Taking advantage of business relationships involving some of the PSC board members, the board interviewed representatives of between four and six investment banking firms. In the late fall of 1998, PSC engaged Advest in that capacity. Advest's work relating to the PSC sale was led and coordinated by its employee, Rex Green. Under the fee arrangement between

13

PSC and Advest, Advest was to be compensated for its sales efforts based on the amount that a buyer paid to acquire PSC shares. *See* Dissenters' exhibit 49. That compensation ("the success fee") consisted of several tiers of percentages tied to that sale price, supported by a minimum fee of $250,000. The incremental percentages increased with a higher transaction price. Thus, Advest's compensation would increase geometrically if PSC's shareholders received a higher tender offer price. In addition to the task of acting as a broker in marketing and attempting to orchestrate a sale of PSC, Advest also agreed to provide PSC with a fairness opinion regarding the merits of any proposed sale.

Advest then assembled a list of entities that, from Advest's view, could have an interest in acquiring PSC. *See* Dissenters' Exhibit 72. These prospective contacts included other businesses in the shoe industry and firms that might have other reasons to be interested in the acquisition (most importantly, financial investors who were not otherwise associated with the shoe industry). The list resulted from suggestions made by PSC itself as well as from Advest's own contacts, its research of other transactions and from informational sources such as trade associations. From the final roster of potential interested parties, Advest contacted more than fifty companies or firms. Of these, fifteen or twenty potential buyers had enough interest to justify Advest's submission of a confidential memorandum that provided those parties with more information about PSC and its condition. From that group, five or six of those entities continued in the process.

Ultimately, two shoe companies – Daniel Green Company (DGC) and Valley Lane Industries Company – made offers to acquire PSC. Their initial expressions of interest were not the product of Advest's marketing efforts. In early 1999, Daniel Green's president, James Reidman, had a telephone call with PSC's comptroller, David Keane, to express sympathies for the unexpected death of PSC's president in late 1998. During that call, Reidman mentioned almost parenthetically that DGC would have an interest in acquiring PSC if the opportunity arose. This expression of interest was eventually relayed to Advest, which then communicated directly with DGC during the negotiation and sale process. Similarly, a representative of Valley Lane had some contact with Irving Kagan, and Kagan referred the matter to Advest.

After the death of PSC's president, Kagan agreed to return as the company's CEO, and he was compensated for that work. He declined, however, to become president

again and instead reconfigured that position so that three senior members of PSC's management, who in turn would function under Kagan's direction, would discharge the day-to-day responsibilities of the president. Nonetheless, Kagan was integrally involved in the operations of the company, and the court accepts his testimony that, despite the personal and professional loss that he and others associated with PSC suffered with the death of the president, he was invigorated by his renewed involvement in the company.[7] Both prior to and subsequent to his change in roles within the company, Kagan was closely involved in the developments that ultimately led to DGC's acquisition of PSC.

PSC's earnings for 1998 (which was treated as the second year for purposes of the three-year plan, following the disappointing performance in 1997) and 1999 improved from the preceding period of time. PSC's decision-makers believed that its stronger, recent performance put the company in good position to be acquired on favorable terms.

The first quantified expression of interest for PSC that could be taken seriously was submitted by DGC in late March 1999. That offer, which followed DGC's review of certain financial records of PSC under a confidentiality agreement, was presented at $8.50 per share and was subject to a number of conditions. *See* Dissenters' exhibit 83. At that time, the stock price of PSC shares was at or near that level. That offer was far below PSC's expectations, and, much to the unhappiness of Reidman, who had submitted

---

[7] Sometime after the PSC board approved the sale of the corporation to DGC, Kagan had a conversation with Nerges and said that he (Kagan) would not have sold his interest in the company if he were ten years younger. This expression is consistent with a reference in one of the merger documents filed by PSC that Kagan wanted to sell his shares for purposes of estate-planning and other financial goals. *See* Dissenters' exhibit 212 at p. 6.

These facts are not inconsistent with the court's finding that Kagan was fully engaged in working actively for the company following the death of its president in late 1998. The court construes the evidence to demonstrate that despite Kagan's sense of satisfaction in going back to work unexpectedly for the company that had been an integral part of his life for many years, he was at a stage of his life where he did not want to do that indefinitely. On the other hand, the court finds that although Kagan wanted to sell his interest in the corporation, his interest was to protect and promote the interests of all of PSC's shareholders. If his sole or primary interest was to liquidate his holdings without regard to the interest of others, he would have accepted the offer extended to him privately by Reidman, noted in the text below, to sell his shares and then let the other shareholders fend for themselves. This sensitivity toward the rights and interests of the other shareholders goes back as far as the 1970's, when PSC established a process by which Lown could redeem his shares but only after other shareholders were given the first opportunity to benefit as Lown wanted to benefit.

the offer on behalf of DGC, PSC did not make a counteroffer. Several weeks later, DGC – on its own initiative – increased its offer to $10.50. *See* Dissenters' exhibit 84. Because this offer was sufficient to maintain PSC's interest, DGC then was permitted to examine additional PSC financial records as part of its due diligence analysis. However, in early May, Advest advised DGC that it was not willing to engage in "formal negotiations at the $10.50 share valuation" that DGS had proposed earlier. *See* Dissenters' exhibit 176.

In the meantime, Valley Lane continued its interest in acquiring PSC and, in late April, advised PSC that it was considering a purchase price of somewhere between $9 and $11.25 per share. *See* PSC exhibit 28. In early May 1999, Advest made a formal presentation to Valley Lane regarding PSC, and Valley Lane representatives were afforded access to PSC records. After those events, Valley Lane advised PSC that it was interested in acquiring PSC, but at a price of $8.50 per share – less than the amount they suggested initially. *See id.*, exhibit 30. PSC rejected the offer and did not attempt to pursue the matter with Valley Lane because PSC's board members felt that is was not in the range where such discussions were warranted. Nonetheless, because Advest considered Valley Lane to be a knowledgeable and legitimate player in the shoe industry, it considered Valley Lane's more informed assessment, reflected in its reduced offer, to be instructive of the limited potential for sale. Advest conveyed this observation to PSC and recommended that PSC intensify its efforts to deal with DGC.

As part of that process, Advest constructed and provided DGC with a model that represented the synergistic virtues of DGC's acquisition of PSC. In early June, PSC submitted a counteroffer to DGC, consisting of combined consideration of $11.25 per PSC share, and receipt of as many as 700,000 shares of DGC corporate stock. *See* Dissenters' exhibit 95. DGC then made a further offer of $11.50 per share, subject to a $.50 per share earnout that would be determined on the basis of PSC's financial performance through a future date. Throughout this time, however, PSC was quite wary about PSC's financial condition and was uncertain whether DGC had the resources necessary to consummate an acquisition without exposing PSC's investors to DGC's perceived weaknesses. It appeared that DGC was having difficulty making the financial arrangements that could support an offer acceptable to PSC. In this context, PSC

declined to agree to a $1.5 million termination fee that DGC had sought in the event that the parties could not come to terms. In fact, even though the prospects of a sale to DGC were real, Advest recommended that PSC authorize it to continue to market the company in an attempt to find a contingent buyer. At that point, however, PSC and DGC continued their discussions on an ongoing basis. A deal between PSC and DGC appeared to be increasingly likely, and Advest did not pursue that alternative course.

In early September 1999, Advest, represented by Green and several others, met with the PSC board to assess the status of PSC's negotiations with DGC and, more specifically, to discuss the merits of the then-existing tender offer of $11.75 for each share of PSC stock. Advest expressed its "preliminary opinion" that DGC's tender offer represented the fair value of PSC shares. *See* dissenters' exhibit 122 at p. 3.

At some point during 1999, Reidman approached Kagan directly and proposed to purchase the interest of the Kagan family members, which constituted a majority of outstanding shares. Even prior to any discussion about the price Reidman would be willing to pay for those shares, Kagan promptly rejected that suggestion because such a transfer would not be beneficial to all shareholders.

Ultimately, on October 6, 1999, the PSC board of directors met to consider a sale of PSC to PSC Acquisition Corporation (with the expectation that the ultimate buyer would be DGC) based on a tender price offer of $11.75 per share.[8] That figure represented was the midpoint of the range that accompanied the offer in which the earnout was included. (Several days earlier, PSC had notified Reidman Corporation that

---

[8] Putting it more precisely, under the terms of the agreement, PSC would be acquired by PSC Acquisition Corp, a wholly owned subsidiary of Reidman Corporation. Reidman Corporation owns a substantial minority interest in Daniel Green Corporation. James Reidman, whose contact with PSC in early 1999 began the acquisition process, is the CEO and president of both concerns. Many of the proposals under which DGC itself would acquire PSC's shares included financing arrangements, all of which PSC found unacceptable. Therefore, in September 1999, Reidman Corporation became the prospective buyer, and the transaction was structured as a cash-only deal. *See* Dissenters' exhibit 176. At the end of March 2000 (several months after PSC Acquisition Corp. acquired PSC), Reidman Corporation sold all outstanding shares of PSC stock from PSC Acquisition Corp. to DGC. *See generally* dissenters' exhibit 243. DGC is now known as Phoenix Footwear Group. In this opinion, the court may refer to the acquisition as one by DGC of PSC (although that result did not obtain directly) because that was the intent and the ultimate result.

17

it would accept a tender offer price of $12 per share. Reidman rejected that demand and replied that it would not exceed $11.75 per share.) Despite its previous proposal that involved a transfer of DGC shares, in the end PSC insisted that DGC acquire its shares with cash and not through a stock transfer, because of PSC's concerns for DGC's financial stability. Therefore, PSC rejected alternative proposals for financing structures that Reidman represented were backed by personal and other guarantees. At the October 6 board meeting, Advest expressed its opinion that that tender offer price reflected the fair value of the company's shares. *See* Dissenters' exhibit 17. The board members concluded unanimously that the tender offer price protected the best interests of the corporation's shareholders and unanimously approved the proposed agreement. The agreement was subject to the condition that PSC Acquisition Corp. would acquire 80% of the outstanding shares of PSC corporate stock no later than November 16. *See* dissenters' exhibit 176 at "Annex A" dissenters' exhibit 169.

The agreement was announced publicly the next day. Pursuant to the agreement, in November PSC Acquisition Corporation acquired more than 80% of the outstanding shares of PSC based on the agreed tender offer price. A shareholders' meeting was held on January 17, 2000, for the purpose of considering and voting on the planned acquisition. On that date, the merger was approved. As of then, Nerges owned 133,300 shares; McCullough owned 12,000; and Buta owned 3,000.

## C. Fair value analysis

The evidence in this case includes the testimony of two experts in the field of corporate finance: the dissenters' expert, Raymond Neveu, and PSC's expert, Rex Green. Both experts examined PSC as a source of investment value. Additionally, however, in contrast to Neveu's analysis, Green considered the fair value of PSC on several other bases: how PSC's value as an entity compared to the values of other publicly traded corporations in the apparel industry; how it compared to publicly traded corporations that had been sold in their entirety within several years prior to January 2000; and PSC's net asset value. Finally, the experts considered – and rejected – any suggestion that the inherent, fair value of PSC should be gauged on the basis of its fair market value. The Delaware block method prescribed by the Law Court in *Libby* requires the court to at

18

least examine the merits of a corporation's investment, net asset and fair market values. Further, although the Law Court's expansion of the corporation valuation methodology, as reflected in its decision in *McLoon*, does not specifically endorse either of the two comparative models that Green has proposed, the court finds that those approaches certainly fall within the scope of "other generally accepted and admissible valuation techniques." *McLoon*, 565 A.2d at 1003. Therefore, it is appropriate to consider these additional appraisal tools as well.

In addition to the testimony of the two expert witnesses, the trial record includes valuation opinions presented by at least four witnesses who were not designated as experts but who were permitted to offer those opinions by virtue of their ownership of shares of PSC corporate stock. *See, e.g., State v. Doray*, 359 A.2d 613, 614 (Me. 1976).[9] These witnesses included two of the three dissenting shareholders, and two former members of PSC management, including Kagan. The testimony of the dissenters and Kagan in particular[10] cannot be dismissed out of hand, because the dissenters have a background in the investing world, and because Kagan offers an intimate knowledge of the PSC's history in the footwear industry and of its financial track record. However, in the end, the court concludes not to give weight to the testimony of any one of them.

The expertise of both Neveu and Green are not susceptible to reasonable challenge. Although their roles in this case have a different genesis and although the opinions of both have their strengths and weaknesses, their basic competence to offer expertise to bear on the disputed issues is established on this record and has not been seriously challenged by any party. On the other hand, none of the other witnesses was even been designated as an expert, and therefore, in that procedural context, they were

---

[9] The admissibility and extent of a non-expert's opinion testimony was the subject of considerable discussion among counsel and the court during the trial. The parties' arguments and the court's rulings are set out on the record. The issue to be addressed here is the weight that the court should assign to that testimony.

[10] The fourth non-expert opinion witness was David Keane, who held several management positions with PSC prior to and, for awhile, following the merger. Although he was permitted to offer his opinion of value because he had owned some PSC shares, the record does not reveal a more substantive justification for attaching meaningful weight to that testimony in this complicated appraisal analysis.

permitted to testify only because of the fact that they happened to own shares of PSC stock. Thus, from that procedural perspective, none of the parties has held out any of these four former shareholders as an expert. In the case of the dissenters themselves, that means that as parties to this action they have not even held *themselves* out as experts.[11] This has inherent significance, but it also has an important procedural consequence. Because they are non-experts but offering, in essence, expert opinions, the opposing party or parties are substantially inhibited in their opportunity for meaningful cross-examination. For example, because these non-expert witnesses are not subject to the provisions of Article VII of the rules of evidence, there is no limit to the basis for their opinions – which, as the court understands Maine law, they are entitled to present. Thus, during his testimony about the interplay between PSC's overfunded pension and the company's overall valuation, Nerges testified that he read and relied a book on pensions. Similarly, McCollough, a stockbroker, testified that he conferred with a colleague who is familiar with retirement accounts, and he also had his wife talk to store clerks about PSC's brands of shoes. Because of the informal manner in which that evidence was allowed to be introduced into the record, PSC was crippled in its ability to inquire meaningfully about the basis for the resulting opinions. Conversely, the dissenters would face the same difficulties in testing the opinions of Kagan and Keane. That problem has real significance, because the patently uncertain nature of that underlying information and the impediments to followup inquiry on cross-examination makes it difficult for the court to determine how much reliability that information is entitled to have.

Consequently, because the parties presented the testimony of clearly qualified expert valuation witnesses, and because the opinion testimony of the non-experts – although admissible under Maine law – is more marginal and potentially misleading due

---

[11] Indeed, during a colloquy involving this issue during the trial, Nerges' counsel stated expressly that Nerges was not offered as an expert. This avoided any consequence caused by the absence of an expert disclosure under the court's rules and orders, but it directly implicates the concerns addressed in the text of this order.

to the absence of real safeguards that ordinarily accompany expert testimony, the court chooses not to assign weight to the valuation opinions of those non-experts.[12]

Neveu, the dissenters' expert, relied on two intrinsic valuation methods: the discounted future cash flow model, and the Damodaran formula.[13] PSC's valuation expert also relied heavily on the former. Additionally, however, Green considered other methodologies and rested his ultimate opinion in part on those alternative approaches. The court will address the several valuation approaches that were used in this case, beginning with the three that constitute the Delaware block method endorsed by the *Libby* Court, followed by the other methods that were included in the parties' presentations.

## 1. Stock market price

PSC had been a publicly traded corporation, listed on AMEX, since the mid 1960's. However, trading of those shares was very thin. Approximately 1.4 million shares were outstanding and owned by only 107 shareholders of record. *See* dissenters' exhibit 176 at p. 6. Just between themselves, Kagan and his sister owned more than half

---

[12] Because the court's treatment of this evidence rests on the manner in which the opinions of the non-experts' testimony were formulated and presented, the court does not reach the merits of those opinions. It should be noted, however, that if the court did assess those merits beyond the discussion in the text, considerable problems would need to be addressed. For example, Nerges testified that his opinion of nearly $24 per share is based on the *addition* of PSC's net asset book value to a combination of its investment value and market comparables. However, for the reasons discussed below, this general analysis is flawed. First, book value is not a proper way to calculate net asset value. Second, net asset value cannot be added to investment value (or some other value) unless those assets are distinct from the assets needed to generate earnings. (It is interesting – and perhaps ironic – to note that if Nerges' estimate of PSC's net asset value were removed as a component of his final opinion of fair value, the result would be fair value of $12.82 per share, which is not far from Green's assessment, but which is substantially different from Neveu's.) Additionally, Nerges testified that he was not familiar with the methodology used by his own expert; this clearly affects the weight that would be given to Nerges' valuation testimony. There are a number of other problems with Nerges' analysis as well. However, the court does not address them because the more significant financial analyses were presented by the designated experts.

[13] As is noted above, two of the dissenters themselves also considered a second approach, net asset value, in forming their own fair value opinions. However, the court does not give those non-expert opinions any meaningful weight here.

of those shares. *See* dissenters' exhibit 212 at p. 28 (54.1% of the outstanding shares as of January 1999). Additionally, Nerges owned nearly another 10% of PSC stock. *Id.* In large part because of the substantial proportional holdings in the hands of very few investors, the trading volume of PSC shares was light. Indeed, during some weeks, no PSC shares were traded at all. *See generally* dissenters' exhibit 122 at p.6.

During the ten year period preceding the acquisition, PSC's stock price fluctuated between a low of less than $2 per share (1990), *see* dissenter's exhibit 17 at p. 35, and a high in excess of $12, *see* dissenters' exhibit 176 at p. 5.

Neither of the experts has attached any weight to PSC's stock market price in formulating their fair value opinions. Because of the very thin market associated with PSC stock in public trading, the court agrees that the market price of PSC does not embody probative evidence of its fair value. *See Libby*, 406 A.2d at 64.

## 2. Market value: comparison of PSC to other publicly held corporations

One of the several valuation methods used and advocated by PSC is one in which several important aspects of PSC's financial condition are compared to those of similar corporations in the same industry.[14] On the basis of those comparisons, some relative insight can also be drawn to the value of ownership interest in PSC. This model has been described helpfully as "valuation by analogy." Jay W. Eisenhofer and John L. Reed. *Valuation Litigation*, 22 DEL. J. CORP. L. 37, 118 (1997) ("Eisenhofer"). Using this approach, Green identified a handful of companies that, in his judgment, had similar attributes to PSC, and he then identified a relevant financial feature ("operating results," *id.*) of those comparable companies that could be measured against a similar feature of PSC. Here, Green used several such factors, including revenues and EBITDA (the amount of gross sales or revenue, less the costs of generating that revenue and general operating assets, *see* dissenters' exhibit 17 at p. 19, n. 1; *Steiner*, 5 F.Supp.2d at 1130). Then, a "value indicator," *see* Eisenhofer, *supra*, such as total enterprise value (which is the "market value of equity plus debt less cash and equivalents," *see* dissenters' exhibit

_____

[14] Green also used this comparative model in a separate part of his analysis when he compared PSC to transactions of entire corporate entities. This part of his analysis is discussed separately below.

17 at p. 18) or price per share, is identified. A ratio is then established between the comparable's operating results and its known value indicator. This results in a multiple, or capitalization rate, that can be applied to the same operating result of the subject corporation in order to arrive at the same type of value indicator (which is the unknown, in this equation) for that subject entity.

Here, after Green derived multiples from the group of comparable corporations, he applied them to PSC and arrived at a preliminary value per share of PSC stock. Green then made two adjustments: he increased this raw result to integrate a control premium, and he then reduced that product to account for a "small business risk discount." On the basis of these computations, he arrived at a value range of $11 to $13 per PSC share.

In its substance, this general comparative approach is the same one described by the *Libby* Court as is used to determine "investment value." 406 A.2d at 65-66. As Green pointed out at trial, this model has qualitative advantages over the other principal approach used in this case, which is a valuation method based on an assessment of future earnings and cash flow. Rather, this comparative market approach is predicated on ascertainable historical data and does not depend on the more speculative process of attempting to project future events and performance. This comparative process measures investor response to significant financial characteristics of corporations that have important similarities to the subject concern and that have a direct relationship to the comparable company's value indicators. In other words, the process allows inquiry into how an investor assesses a corporation on the basis of those salient features that constitute the reasons for the investor's decision. The analysis then rests on an effort to replicate that investor behavior to attempt to gain insight into how the market would treat the subject corporation, based on the way it did in fact treat the comparables.

However, it also has several inherent weaknesses. First, it is a market-based analysis. The ultimate objective in this valuation process is not to determine the fair *market* value of PSC, but rather its fair or intrinsic value. However, as is noted above, the notions of market conduct can never be divorced entirely from the fair value analysis because, as the *McLoon* Court noted, the test is, "What is the best price a single buyer could reasonably be expected to pay for the firm as an entirety?" 565 A.2d at 1004.

23

Further, the comparative market analysis is weakened by the reality that the subject corporation can and never will be a mirror image of the comparable companies. Inevitably, there will be differences. This has implications for at least two steps of the comparative process: it bears on the choice of comparables,[15] and it bears on the quality of those similarities between the subject corporation and those entities that are used as comparables.

Here, as comparables, Green selected five corporations that are part of the footwear industry. *See* dissenters' exhibit 17 at p. 20. The only objection that the dissenters appear to press regarding the selection of these comparables is the inclusion of Maxwell Shoe Company, whose operating results have the effect of reducing the composite multiples derived from the group of five comparable corporations.[16] As Green pointed out, however, it is important to consider a small size company such as Maxwell because PSC itself is small. Inclusion of Maxwell thus helps to establish some relevance between the data generated from those comparables and the fair value of PSC. Indeed, one could argue credibly that if a company of Maxwell's size were *not* included among the group of comparables, then the remaining corporations would not be comparable in the first place. *See In re: Radiology Associates, Inc. Litigation*, 611 A.2d 485, 489 (Del. Ch. 1991) (considering the relative sizes of comparables and the subject corporation, in determining whether a valid comparison may obtain). Therefore, the court finds that the comparable companies used by Green in this aspect of his valuation analysis are valid and that the multiples derived from those companies' financial performance can properly be applied here.

There are two more significant issues affecting this comparative analysis: the PSC's performance figures to which Green applied the multiples that he derived from the comparable companies; and Green's use of a "small company risk discount." Beyond this, there is also the question of whether it is proper to use a multiple of book value.

---

[15] "At some point, the differences become so large that the use of the comparable company method becomes meaningless for valuation purposes." *See In re: Radiology Associates, Inc. Litigation*, 611 A.2d 485, 490 (Del. Ch. 1991).

[16] As the dissenters themselves characterized it in their written summation, a debate about the Green's comparables would amount to a "quibble."

## (a) Calculation of relevant PSC performance figure

As part of the comparative analysis involving similar public companies, Green was required to establish figures that represented particular aspects both of the comparable companies' performance and of PSC's performance. As is noted above, two of the three performance categories that Green used were EBITDA for the last twelve months ("LTM") preceding the issuance of the opinion, and net income both for 1998 and as projected for 1999. In calculating the EBITDA and net income figures for PSC, Green did not make specific account for transactions that the dissenters maintain resulted in extraordinary and nonrecurring gains or losses.[17]

This "investment value," as it is described in *Libby*, requires the appraising court to adjust earnings figures so that the figure is representative of actual sales performance and is not skewed by gains or losses unrelated to sales performance. 406 A.2d at 65. In fact, during the period covered by the EBITDA and the 1999 net income figures that Green used in the comparable analysis, PSC incurred expenses that could only be described as extraordinary and nonrecurring. These expenses were associated with the untimely death of PSC's president, Paul Hanson, at the very end of 1998[18] and with the DGC merger transaction itself.

PSC paid a death benefit equivalent to Hanson's annual salary plus $5,000. On the basis of David Keane's testimony that Hanson's salary was between $150,000 and $160,000, the court finds that the death benefits paid by PSC was $160,000.

PSC also incurred merger-related expenses. A portion of these expenses is shown in dissenters' exhibit 171. The portion shown there is $635,000. This includes $11,666 (for present purposes, rounded to the nearest thousand) for the cost of directors' and officers' liability coverage. In fact, the total premium for that coverage was $70,000. *See* dissenters' exhibit 15. Because the record does not establish that these two figures associated with the insurance coverage are cumulative, the court will treat the amount

---

[17] The third performance figure was gross sales. Green's failure to account for extraordinary and nonrecurring expenses would not affect this top-line figure.

[18] Despite the year of his death, the president died while PSC was in its 1999 fiscal year, and so the expenses that PSC incurred as a result of his death had an impact on the company's 1999 financial condition.

noted in dissenters' exhibit 171 as overlapping with the bill found in the other exhibit. Although some corporations provide and pay for this coverage as a matter of course, historically PSC had affirmatively elected not to obtain such coverage and instead relied on its own corporate assets to cover any liability that would be within the scope of such coverage (in effect, self-insurance). However, specifically because of the exposure created by the complexities of corporate merger and acquisition, PSC obtained D and O coverage. Because that expense was a direct outgrowth of the merger process and would not have been incurred otherwise, it should be treated identically to the other merger-related disbursements.

Additionally, PSC incurred merger-related legal fees of approximately $10,000 beyond the legal fees included in exhibit 171.[19] *See* dissenters' exhibit 174 (a statement for legal services prepared subsequent to the creation of dissenters' exhibit 171.)

Thus, the total amount of PSC's extraordinary and nonrecurring expenses for the relevant time period is $863,000 ($160,000 + $635,000 - $12,000 + $70,000 + $10,000).

Identification of these extraordinary and non-recurring expenses does not end the analysis on this point. In order that a valid comparison can be drawn between the comparable companies and PSC on the basis of those performance figures, they must be calculated the same way. Otherwise, the analogy fails. Therefore, it is necessary to include extraordinary and nonrecurring expenses in PSC's earning figures if but only if the same categories of figures for the comparable companies also include their extraordinary and nonrecurring gains and losses. Green testified that he did not factor in

---

[19] This amount does not include fees paid to Rudman and Winchell, PSC's Maine counsel. For two reasons, the court declines to include evidence of the firm's bills with the merger-related expenses. First, it cannot be determined from the bills admitted into evidence whether they related entirely to merger issues or whether the firm may have provided other legal services that gave rise to ordinary and recurring legal costs. Second, in order to maintain a level of discretion in the face of a potential acquisition, Rudman and Winchell served as a conduit for a number of PSC's merger-related billings and payments. The trial record does not satisfactorily establish that the bills already accounted for in the figure noted in the text are not also reflected in the firm's bills to PSC.

This amount also excludes legal fees paid to PSC's out-of-state counsel beyond those noted in dissenters' exhibits 171 and 174. Although some of that additional legal work clearly may have been merger-related, the evidence is not sufficient to satisfactorily segregate legal expenses that were for other purposes.

PSC's extraordinary and nonrecurring expenses in part because he did not know in fact if the figures for those comparable companies also reflected them.

Despite this concern, the court concludes that the earnings figures used by Green should be adjusted to reflect that during the relevant time periods, PSC incurred in excess of $860,000 in extraordinary and nonrecurring expenses unrelated to the generation of earnings. At least two reasons support this result. First, the *Libby* Court encourages – if it does not require – this adjustment. Second, the evidence reveals that it is the common practice for corporations to use such expenses to offset gross receipts. Indeed, as Keane testified, PSC itself used the merger-related expenses as offsets against income. Therefore, in order to create a more accurate basis for relating PSC's financial performance to that of the comparable corporations, these expenses should be included.

The treatment of these expenses differs between an analysis of the EBITDA figure and the net income figure, because the two figures represent very different concepts. EBITDA means earnings *before* taxes and interest payments. PSC's EBITDA for the twelve months immediately preceding the issuance of the fairness opinion was $3,364,000. *See* dissenters' exhibit 17 at p. 19. Because this is the amount of PSC's pre-tax earnings, the entire amount of the extraordinary and nonrecurring expenses may properly be added to that amount, resulting in an adjusted EBITDA of $4,227,000.[20] When the relevant capitalization rate is applied to the difference, there is an increase of

---

[20] The EBITDA used by Green in Advest's October 1999 fairness opinion was for the period between approximately October 1998 and September 1999 (LTM). The amount of merger-related expenses shown in dissenter's exhibit 171 was compiled no later than December 1999. Thus, this information would have been available to a reasonable investor on the valuation date in January 2000. The exhibit demonstrates that PSC did not actually take those expenses until October and November 1999, which was after Advest rendered its fairness opinion. However, it appears that most of those expenses had been incurred prior to the date of the fairness opinion. The most accurate financial picture of PSC as of the valuation date would account for those expenses.

This might mean that the "last twelve months" is advanced by about three months (from an ending point in late September or early October 1999 to mid-January 2000). However, either way, an entire year is covered, and, in arguing that the October 1999 fairness opinion accurately depicted PSC's fair value as of the valuation date several months later, Green testified that there were no significant changes in PSC's financial condition between October 1999 and January 2000. Therefore, the court does not find that this possible shift in dates compromises the substance of the analysis.

$3.81 per share ($863,000 x 6.2 /1,404,000 shares[21]) beyond the figure of $17.70 reached by Green, resulting in a total calculated value per share of $21.51.

A different approach must be used when integrating PSC's extraordinary and nonrecurring expenses into it 1999 net income. This figure represents PSC's post-tax earnings. This is demonstrated by the fact that the 1998 net income figure of $1,486,000 is set out as the net, post-tax figure included as historical information in PSC's 1999 financial statement, which was released on January 14, 2000, prior to the valuation date. *See* dissenters' exhibit 178 at cover letter and p. 3. Therefore, the total amount of PSC's extraordinary and nonrecurring expenses for 1999 cannot properly be added to the amount of the company's net income because, without consideration of the tax liability for those expenses, the net income would be overstated by the amount of the tax liability. Before that calculation is made, it should be noted that the Advest fairness opinion used an estimate of the amount of PSC's net income for 1999, because the fairness opinion was finalized prior to the end of PSC's 1999 fiscal year; his estimate was $2,167,000. *See* dissenters' exhibit 17 at p. 19. The company's 1999 financial statement provides the actual figure, $1,678,000, which should be used here. *See* dissenters' exhibit 178 at p. 3.

In 1999, PSC's taxable income was $3,154,000. On that, it paid income taxes of $1,476,000, which reveals an effective tax rate of 47%. The court is willing to assume that the same effective tax rate would apply to the extraordinary and nonrecurring expenses ($863,000), if those expenses had been subject to taxation. This means that PSC would have retained $457,000 of the income used to pay those expenses, if the expenses had not been paid. This net amount must be added to PSC's actual 1999 net income before the capitalization rates are applied. The resulting figure is $2,135,000, which is actually quite close to the figure used by Green because his projected net income for 1999 ended up too high.

---

[21] Close to the valuation date, this was the number of outstanding shares of PSC stock. *See* dissenters' exhibit 176 at p. 6. However, there also was a balance of 16,000 stock options as of the date of the fairness opinion. *See* dissenters' exhibit 17 at p. 19, n.4, and p. 36. The court found no evidence of whether the three individual holding those options exercised them. However, the exercise prices support an inference that they would be exercised. Thus, the court calculates the dissenters' proportional ownership interest in PSC on the predicate that there were 1,404,000 outstanding shares, each with equal value.

When Green's net income analysis is modified in this way, it results in a value of $17.18 per share ($2,135,000 x 11.3/1,404,000 shares).

Once a value per share is calculated on the basis of EBITDA and other performance data, the per share value of any non-operating assets must then be added. *Steiner*, 5 F.Supp.2d at 1128-29. For the reasons noted below, PSC in fact had non-operating assets in the form of excess cash and marketable securities. Green has accounted for much of this in his EBITDA-based calculations. Beyond this, the dissenters do not argue that his treatment of non-operating capital is flawed. Thus, the court makes no further adjustments with respect to this asset.

### (b) Small company risk discount

After Green calculated a value per PSC share based on performance data, he made two further adjustments. First, he increased that PSC share value by 30% as a control premium. Then, he reduced that product by a 40% "small company risk discount." Not surprisingly, the dissenters do not challenge Green's application of a control premium. However, they argue that the small company risk discount is actually a marketability or illiquidity discount, which is improper under Maine law. These discounts are conceptually distinct and must be considered independently.

"A control premium is an increase in the price of shares sold as part of a majority block, which someone will pay in order to gain control of a company." *Steiner*, 5 F.Supp.2d at 1124. Here, the multiples that Green derived from the financial data of the comparable companies ultimately relate to the value of shares that are traded as part of a minority block in those concerns. The goal of the valuation process at bar is to establish the value of PSC as an entirety and, from that, to calculate the dissenters' proportional ownership interest of the entire enterprise. Because a majority or control block is inherently more valuable than a minority block, Green reasoned that the initial calculated values of PSC shares must be adjusted (specifically, increased) by a premium in order to recognize the inherently more valuable quality of a controlling ownership, rather than the minority interest that is the basis for the capitalization rates extracted from the comparable companies. At least one court has rejected the use of a control premium. In *Steiner*, the court concluded that just as a minority discount understates the intrinsic value of a block of minority shares, a control premium overstates it. *Id.* However, other courts

29

have held that application of a control premium is a valid method of countering an "imbedded minority discount" that is inherent in a market comparable. *Bomarko, Inc. v. International Telecharge, Inc.*, 794 A.2d 1161, 1186 (Del. Ch. 1999). Further, PSC advocates the use of that premium here, and the dissenters do not disagree. Therefore, the court adopts Green's use of the control premium and the level of that premium (30%).

Green then applied what he described as a small company risk discount to reach his final value of PSC based on this comparative model. Green explained that PCS was a small, non-diversified company that posed a greater amount of risk to investors than do the comparable companies. Accordingly, to account for this disparity in the nature of the subject corporation and the comparables, he reduced the value of a PSC share by 40%. The dissenters argue here that the small company risk discount is really a disguised minority or illiquidity discount prohibited by *McLoon* and that even if it is as Green claims, it is an improper component of the market comparable analysis.

The dissenters have called into question the true nature of this discount. Indeed, the evolution of Advest's fairness opinion certainly fuels this argument. When Green, as Advest's representative, met with the PSC board in early September 1999 to offer interim advice on the merits of DGC's offer, he provided a valuation analysis. That analysis included the same type of comparative assessment that Advest later used in the October fairness opinion and that Green used in his capacity as a valuation expert at trial. As part of Advest's presentation at the September 7 board meeting, the board was presented with the following observation: "Given the relative lack of liquidity in the public marketplace for PSO's [PSC's] stock, a discount to other comparable companies of 20% - 45% is appropriate." Dissenters' exhibit 122 at p. 10. Further, in a footnote to some quantitative data submitted to the board, Advest noted: "A number of institutionally accepted valuation studies suggest that reasonable marketability or illiquidity discounts for shares of a public companies [sic] with market characteristics similar to PSO [PSC] generally range between 20% and 45%." *Id.* at p. 11, n.2. As is discussed below in connection with the question of whether the tender offer price is indicative of fair value, Kagan and his sister owned a controlling block of PSC shares. Therefore, the remaining shares – those traded on the market – were necessarily minority shares. This historical lack of liquidity in the market noted by Advest must be seen as a reference to those minority

30

shares. If so, because that illiquidity is associated only with a minority interest, and it cannot be injected into the fair value analysis.

Further, despite this analysis offered in September, one month later when Advest issued its formal and final fairness opinion, the same market comparison analysis made no reference to marketability or liquidity discounts. Rather, the only discount, which, as noted, was 40% -- within the range of the marketability/illiquidity discount invoked a month earlier – for the "small business risk discount." Such a discount had not been part of the comparative analysis presented to the board at the September 7 meeting. Seeing a similar discount factor but apparently different explanations for that discount, the dissenters contend that the small business risk discount is actually a marketability or illiquidity discount that was condemned by the *McLoon* Court and that the change in labels was Advest's (and Green's) attempt to disguise the error.

At trial, Green testified that the liquidity reference was erroneous and that he intended to integrate into the comparables analysis the notion that investments in small cap companies are riskier than investments into larger cap companies. The court need not resolve the issue as it has been framed here because even if this aspect of the fairness opinion truly rests on a small business risk discount, PSC has not demonstrated here that the discount is a proper element of the market comparison analysis.[22]

_____

[22] If Green's characterization of the marketability discount as "not relevant," when that discount was used in the September 7 analysis, can be interpreted to mean that such a discount is analytically improper, then Green *may* have given too much away, although the court need not and therefore does not reach this issue. Maine law clearly provides that the valuation of a dissenter's shares may not be influenced by the fact that those shares may constitute a minority or non-controlling interest in corporate ownership and decision-making. *McLoon*, 565 A.2d at 1005. Rather, the value of a minority interest is the "full proportionate value" of those shares. *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1141 (Del. 1989), *quoted in McLoon*, 565 A.2d at 1005. A minority discount has the effect of creating different values for shares of stock in the same company: a share included in a minority block is deemed to have less value than a share included in a controlling block. A minority interest is also less marketable and therefore more illiquid. Minority and marketability/illiquidity discounts therefore are related in their effect when either type of discount is applied at the shareholder level. *See Casey v. Brennan*, 780 A.2d 553, 571 (N.J. Super. 2001), *aff'd* 801 A.2d 245 (2002); *cf. Pueblo Bancorporation v. Lindos, Inc.*, 63 P.3d 353, 360 (Colo. 2003) (closely held corporation). Consequently, if any of those discounts is applied at the shareholder level, then the value of shares held by a minority shareholder is understated.

31

The Law Court's decision in *McLoon* adopted the post-Delaware block valuation framework set out by the Delaware Supreme Court in *Weinberger*. 565 A.2d at 1003. *Weinberger*, in turn, adopted the following standard for acceptable valuation methods: "We believe that a more liberal approach must include proof of value by any techniques or methods that are generally considered acceptable in the financial community and otherwise admissible in court, subject only to our interpretation of" Delaware's statute requiring the judicial appraiser to establish "fair value." 437 A.2d at 713.

At trial, Green explained the conceptual basis for applying the small business risk discount, which is noted above. The dissenters pressed him to identify any authority that

---

On the other hand, some courts have held that an otherwise proper discount may not be objectionable as long as it applies to all shares of stock. A discount that is applied only to some shares issued by a corporation results in the harm identified in *McLoon*. However, when the discount is applied at the corporation level rather than at the shareholder level, then it may become a tool used to value the entire corporate entity in which a minority shareholder holds a proportionate interest. *Balsamides v. Protameen Chemicals, Inc.*, 734 A.2d 721, 733 (N.J. 1999) (recognizing that the value of a corporation as a whole may be discounted when its shares of stock are illiquid, as in a closely held corporation); *Cavalier Oil*, 564 A.2d at 1144-45. *But see Borruso v. Communications Telesystems*, 753 A.2d 451, 460 (Del. Ch. 1999) (holding that an illiquidity discount is improper even at the corporation level, because that discount is "based on trading characteristics of the shares themselves, not any factor intrinsic to the corporation or its assets."). Here, Green applied a discount while determining the value of PSC as an entirety. Because the discount was not applied to only selected shares, such as those of the dissenters, then the abstract application process by itself might not violate the principles adopted in *McLoon*. Despite the dissenters' argument to the contrary, the holding in *Pueblo Bancorporation* does not foreclose application of a marketability discount at the corporation level. Rather, it specifically addressed the question of whether the value of minority shares in a closely-held corporation could be discounted because of their illiquidity: "The trial court must determine the value of the corporate entity and allocate the dissenting shareholder his proportionate ownership interest of that value, without applying a marketability discount *at that shareholder level*. The court of appeals decision is affirmed." 63 P.3d at 369 (emphasis added).

However, here, the court need not address the question of whether the application of an illiquidity discount at the corporation level is proper. Green testified at trial that he did not mean to apply the concept of a marketability or illiquidity discount and instead relied on the distinct concept of a small business risk discount. For the reasons stated in the text, the court concludes that the record does not support this latter approach. From that conclusion, the court declines to return to Green's original characterization, which he appears to have rejected during his trial testimony, and formally consider the merits of that abandoned position.

supported or advocated the use of the discount in the analytical context of market comparables. The Advest fairness opinion, which is the basis for Green's own opinion, stated that there are "widely accepted studies" supporting the use of a small business risk discount. *See* dissenters' exhibit 17 at p. 17. However, earlier, when Green was deposed during pretrial discovery, he said that he used the discount because it was fair and reasonable to do so. During that deposition, Green also testified that he was not aware of any treatise or other authority that supported the use of a 40% small company risk discount. At trial, Green said that in fact the small company risk discount is a method approved by Ibbotson, an acknowledged expert in the field. Then, Green retreated and clarified that Ibbotson's work does *not* support the use of a small company risk discount in a company-to-company comparison. In the end, although given full opportunity to do so, and forewarned of the issue prior to trial, Green was unable to identify any recognized authority to support the application of a small business risk discount in this valuation method.

In attempting to defend his use of the discount, Green referred to studies conducted by Advest itself, in which publicly traded corporations were segregated into ten groups (deciles), ranked by relative levels of capitalization. The smallest group was itself then bifurcated. PSC was one of those 5% lowest capitalized corporations. Because the price-earnings ratios of the smallest groups were found to be smaller than those ratios associated with the largest corporations, Green argues that the risk factor for investments in the former is greater and therefore justifies the discount he used here.

As a matter of weight, however, the court is not persuaded by that analysis. The court is troubled by Green's unsuccessful effort to associate the discount with recognized authority. Beyond the difficulties created by this testimony, the evidence is that a leading scholar in the field in fact has not recognized the use of a small company risk discount in a comparable companies valuation approach (despite Green's incorrect and subsequently retracted testimony that he had). Advest's proprietary information associated with the decile analysis is not convincing on this record. There may be many reasons for the phenomenon of differing P/E ratios. More importantly, if the creation and application of a small company risk discount is as obvious as Green suggests and flows from basic notions of reasonableness, then one would expect someone such as Ibbotson – or any

33

other authority in the field – to have endorsed that method. Despite the fact that Green was put on notice at his deposition that this issue would be used at trial to challenge his opinion, he was unable to correctly identify any such authority during trial.

It is worthy of note that the *Libby* Court did affirm application of a discount when the multiples of comparable companies were applied to the relevant feature of the subject company. 406 A.2d at 66. This discount was justified because the subject company "had lagged well behind all three of its competitors [the comparables] in all the areas investigated. . . ." *Id.* Here, in contrast, Green created and applied a small business risk discount not because of the relative quality of PSC as gauged against such factors as used in *Libby* ("sales, profit margins, inventory turns, capital spending history, and dividends records," *id.*). Rather, the discount arose entirely from the differential between the naked size of PSC and that of the common or average size of the comparables. As is noted above, PSC has not presented persuasive evidence that an appraiser may properly discount the value of a company, relative to the value of others, due to size alone. The analysis proposed here by PSC is therefore not supported by *Libby*.

On the basis of these circumstances, the court concludes that PSC has not demonstrated that the application of a small business risk discount is a proper valuation method in a company-to-company comparison. Therefore, the court does not accept the results of that application.

Green testified that if the small business risk discount is not used, then application of the control premium is brought into question. However, as he himself explained at trial, the two adjustments are distinct, and the evidence does not reveal a persuasive reason why if one discount cannot be applied properly, the other is also unavailable.

For these reasons, the court concludes that the control premium may properly be used as an upward adjustment of the value of PSC's shares when compared to similar companies in the industry but that PSC has not demonstrated that a small company risk discount is proper. Tracking the chart included in Advest's October 1999 fairness opinion, *see* dissenters' exhibit 17 at p.19, the implied values per share of PSC stock are therefore as follows:

• TEV multiples of LTM sales: $15.73

•TEV multiples of LTM EBITDA: $27.96[23]
•Multiples of net income, 1998 sales: $17.03
•Multiples of net income, 1999 sales (actual): $22.33.[24]

There is no apparent and compelling reason to give greater weight to any of these values over the others. Thus, the court uses the mean, namely, $20.76, as the result of this analysis.

### (c) Book value multiple

One of the five comparable measures that Advest and Green used in this valuation approach was a multiple based on book value. For the reasons set out below, the evidence does not justify reliance on a book value appraisal analysis. Therefore, the court does not find the book value-based comparison to carry any probative weight, and the court disregards it as an element of the comparable measure.

### 3. Net asset value

As is noted above, Neveu did not engage in a distinct analysis of PSC's net asset value.[25] On the other hand, during his trial testimony, Green assessed PCS's net asset value and in fact placed some weight on that value in determining his opinion of PSC's overall fair value. As of the end of PSC's 1998-99 fiscal year, which was near the end of November 1999, the corporation's balance sheet revealed a net asset book value of $13,292,000. *See* dissenters' exhibit 178 at p. 2. As Green analyzed the data shown on

---

[23] $21.51 x 1.3 (control premium) = $27.96.

[24] $17.18 x 1.3 = $22.33.

[25] It is worthy of note, however, that an aspect of this valuation method plays a part in Neveu's discounted cash flow assessment. In calculating the present value of PSC's future cash flows, Neveu had excluded from consideration PSC's non-operating assets, which consisted of a significant portfolio of marketable securities and what he deemed to be "excess cash." Because he concluded that these assets exceeded the amount of capital needed to fund its business operations, they were not properly considered in determining the prospects for future earnings. Because they were not considered in that part of the discounted cash flow analysis, but because those assets have financial value, that value must be added to the present value of PSC's future cash flow. Therefore, although Neveu did not use the net asset value approach as Green did, Neveu did consider the value of PSC's non-operating assets as a component of the corporation's overall intrinsic value.

that balance sheet, he did not know if the stated value of PSC's real estate holdings was at a fully depreciated amount.[26] (The book value of an asset is calculated by subtracting that asset's book depreciation from its historical cost. *Libby*, 406 A.2d at 67.) In an effort not to understate the value of those assets, Green then added a real estate appraiser's opinion of value for the real estate and buildings to the net asset book value shown on the corporation's balance sheet. Dividing the sum of those figures by the number of outstanding shares, Green arrived at a NAV/share value of $10.36.

This analysis, however, is affected by a number of significant problems. First, it appears that the value assigned to PSC's assets in the 1999 balance sheets are those assets' book value. As is noted in the introductory section to this opinion, the Law Court has made clear that book value is a distinct concept from market value and thus does not provide a meaningful insight into the actual value of the corporation, when the corporation is valued on the basis of its real holdings. *Libby*, 406 A.2d at 66-67.

Second, it appears that the basis for Green's financial analysis would reveal PSC's *liquidation* value, rather than its true NAV. A full and proper NAV analysis must account for the corporation's intangible assets, *Libby*, 406 A.2d at 66, such as its intellectual property and goodwill. *See Radiology Associates*, 611 A.2d at 496. Rather, the assets that are categorized in PSC's balance sheet appear to be limited to tangible assets. During his testimony, Green acknowledged that his view of NAV would represent a component of fair value that would be realized only if the corporation ultimately failed. A liquidation value is obviously even more limited than a NAV, which, as is noted below, is regarded as a particularly inappropriate valuation method for a corporation in PSC's circumstances. Thus, when NAV is seen more fully, as the *Libby* Court treated it, as the combined net values of both tangible and intangible assets, then Green's calculations may significantly understate the proper net asset value of PSC.

Third, when Green supplemented PSC's balance sheet with appraised values of the land and buildings owned by the corporation, he used figures developed by a real estate appraiser, Guy Chapman, who, well after January 2000, was retained to develop a fair market value that the assets would have had as of October 6, 1999. Conceptually, that process is valid: there is no reason why a value cannot be established *post hoc*. Of

---

[26] Those holdings consisted of two parcels of improved real estate located in Old Town.

the several appraisal methods available to Chapman, he ultimately relied on the sales or market approach. This called for him to examine transactions of properties that he deemed comparable and then to make adjustments based on differences between the comparable properties and the subject properties, resulting in a translation that would provide insight into the terms of a hypothetical sale of those subject properties. For both PSC parcels, he considered the same group of comparables and ultimately selected seven of them. However, one of the seven comparables was the subject of a sale that occurred in July 2000 – well after the January 2000 valuation date. For the reasons discussed earlier in this order, the valuation of PSC must be determined on the basis of information that was available as of the valuation date. It is significant that Chapman indicated that the property sold in July 2000 was the best comparable of the ones he used. *See* PSC exhibit 60 at p. 37; PSC exhibit 61 at p. 39. The remaining six transactions used by Chapman occurred prior to the valuation date. However, the improper comparison appears to have carried particular weight in Chapman's analysis, and the court declines to speculate about opinions that Chapman might have reached if he had not considered the post-valuation date sale. In the greater scheme of things, it is possible that this flaw in the NAV analysis is not of great significance, because the additional value attributable to the two parcels of property is less than 10% of the total NAV assigned by Green to PSC, and any adjustments of that figure required by the improper basis for Chapman's opinion would not negate the fact that the two parcels have *some* value. Nonetheless, it is a matter of note.

Fourth, it is curious that when Advest conducted its fairness analysis and submitted its fairness opinion to the PSC board, it did not consider or rely on a NAV approach. Rather, Advest formulated its opinion on the basis of two categories of market comparables (namely, comparisons to other publicly held corporations, and comparisons to recent corporate acquisitions) and on a discounted future cash flow model. Green spearheaded Advest's work with PSC both in orchestrating the acquisition of the company by DGC and in submitting the fairness opinion that directly encouraged the PSC board to approve the transaction. Therefore, although Green was integrally involved in those pre-merger events, neither he nor any other Advest representative considered the NAV approach. At trial, however, it played a modest but nonetheless affirmative role in

his valuation assessment. The court can only infer that if the NAV assessment is helpful in shedding light on the value of PSC as an entity, Green and Advest would have seen fit to consider it earlier.

Finally and most importantly, the NAV model must be treated with extraordinary caution in the circumstances of this case because of the nature of PSC's business. It is uniformly recognized that a corporation is most valued, not for the proportional beneficial interest in its assets that a shareholder acquires upon purchase of shares of stock, but rather for its forward-looking investment benefit. *See, e.g., Libby*, 406 A.2d at 66-67. There are exceptions to this fundamental rule. For example, when "a corporation is undergoing an actual liquidation," it is proper to consider its NAV. *Hansen v. 75 Ranch Co.*, 957 P.2d 32, 42 (Mont. 1998). This, of course, is because when a company is liquidated, it does not offer the promise of a future income stream and has value only for those existing assets that are to be sold. Additionally, if corporate assets include "significant natural resource assets or. . . significant non-operating assets," then the corporation's NAV is entitled to meaningful weight. *Radiology Associates*, 611 A.2d at 496. However, the NAV valuation model is particularly inappropriate for manufacturing and service industries. *Steiner*, 5 F.Supp.2d at 1137. The nature of PSC's business is clearly distinguishable from those where NAV has been given evidentiary significance in valuation cases, and, in fact, PSC clearly falls into the category of corporate concerns where NAV is affirmatively regarded as an improper valuation tool.

When the conceptual objection to NAV assessment is combined with the specific analytical problems that apply to this particular case, the court concludes that NAV is not a proper factor in determining PSC's fair value. If the NAV approach in this case were supported by better quality evidence, then the court might have been inclined to give that valuation evidence some weight. Although the amount of that weight would not be significant, the long-term history of PSC was not particularly dynamic: its financial performance had been contained within well-defined parameters and the best efforts of management had not allowed PSC, as Kagan described it, to break into the footwear industry on a larger scale. Indeed, several years prior the DGC acquisition, the PSC board had given some thought to the option of liquidation, although, of course, that option was not pursued. However, history is a guide in some measure, and in principle

38

an assessment of PSC's fair value should not disregard the value of its assets. However, for the reasons noted here, there are too many problems with the quality of the NAV analysis to allow its results to play a role in the ultimate valuation question.

### 4. Discounted future cash flow value

Both Neveu and Green assessed the fair value of PSC shares on the basis of a discounted future cash flow analysis. Indeed, Neveu rested his opinion largely on this valuation method, although he also considered the Damodaran model discussed below. The discounted future cash flow method is viewed as a legitimate valuation analysis, *Radiology Associates*, 611 A.2d at 490; *Steiner*, 5 F.Supp.2d at 1129; *see also McLoon*, 565 A.2d at 1003 (noting the trial court's consideration of a discounted cash flow analysis as part of the assessment of a corporation's investment value), and that legitimacy is not questioned here. In fact, when the Delaware Supreme Court opened up the scope of acceptable valuation analyses in *Weinberger*, the discounted future cash flow analysis was one of the two methods of assessment that the trial court was instructed to consider on remand. 457 A.2d at 712, 714. Even a casual survey of court opinions in stock valuation cases demonstrates that is a commonly used method.

The discounted future cash flow valuation analysis is ultimately intended to determine, as its name suggests, the present value of earnings that the subject corporation will generate in the future. In this way, it is a qualitatively different analysis than the other investment value methods, namely, the market and acquisition comparables, because the latter approaches rest on the subject company's past earnings. Instead, the discounted future cash flow analysis is predicated on projections of future performance. The subject company is then assumed currently to have the value of those future earnings, discounted to their present value.

There are several discrete steps in the discounted future cash flow analysis. The first step of this valuation method is to estimate the net cash flow over a future period of time ("the projection period"). *Radiology Associates*, 611 A.2d at 490. In evaluating the accuracy of these projections, the court may consider whether the subject company's management was involved in their formulation. *Id.* When forecasting future net

earnings, is also appropriate to consider the company's earnings history and the condition of the industry as a whole. *Citron*, 584 A.2d at 509.

Next, the appraiser must establish a residual or terminal value, which is the sum of future net earnings for the lifetime of the corporation not including and subsequent to the projection period, reduced to their future value as of the end of the projection period. *Radiology Associates*, 611 A.2d at 490, 492.

Third, the present value of the sum of the future net earnings for the projection period, and the future value of the terminal value must be established. This is accomplished through the application of a discount rate which is equivalent to the cost of capital, "that is, the interest rate at which the company would have to invest the 'present value' in order to have the projected future value at the end of the projection period." *Steiner*, 5 F.Supp.2d at 1132.

Finally, if the subject corporation has non-operating assets, then the value of those assets must be added to that part of the company's value that is based on the discounted future cash flow, because any such non-operating assets would not otherwise be taken into account in a model that is based entirely on the company's capacity to generate earnings through its business operations. *Steiner*, 5 F.Supp.2d at 1136; *Radiology Associates*, 611 A.2d at 495.

### (a) Future earnings and growth rate

During its lifetime, PSC sold and sometimes manufactured one line of shoes, Trotters. Certain styling features of those shoes would be changed to update them and to accommodate fashion trends and interests. Nonetheless, there was no change in PSC's base product. However, during the several years leading up to the acquisition, PSC had been developing a second line of footwear called Softwalk. When DGC acquired PSC, Softwalk was about to be introduced into the marketplace; PSC had planned to initially offer the Softwalk line in spring 2000, which was half a year following the valuation date. *See* dissenters' exhibit 101. The prospective performance of this new line of shoes clearly complicates the task of attempting to project PSC's future earnings as of January 2000. As late as October 1, 1999, the PSC board recognized "that any estimate of future performance [based on the Softwalk line] was preliminary and speculative." *See* dissenters' exhibit 138 at p. 2. At the very least, it creates uncertainty about the amount

of sales that Softwalk and PSC as a whole would generate, and it also has an impact on PSC's balance sheet, which, in turn, reflects on PSC's cash flow. In assessing the witness' projections of future earnings, Green has had some advantage because he consulted with PSC management regarding its expectations for PSC's performance when Softwalk was to be presented to the public. *See Radiology Associates*, 611 A.2d at 490. Additionally, although projected earnings should not be based simply on averages of past earnings data, *Steiner*, 5 F.Supp.2d at 1130 – particularly in the circumstances at bar, where a new product line was to be introduced --, a company's earnings history and the condition of the industry as a whole are proper considerations, as is noted above. *Citron*, 584 A.2d at 509.

The court finds Green's earnings and cash flow projections for the projection period to be reasonable. For 2000, he projected a significant net loss. This is largely because of a substantial investment for non-cash working capital. This has two components: a large build-up of inventory, and accounts receivable. Both are closely associated with a new product line. By the beginning of PSC's 2000 fiscal year, PSC had established a large inventory of Softwalks in preparation for distribution to retailers. One would expect that as Softwalk shoes were introduced on the market and, PSC hoped, created consumer interest, there would be a demand for those shoes that might diminish over time after those consumers purchased their shoes. In order to ensure availability of Softwalks during the early marketing efforts, PSC needed to maintain a strong inventory. Otherwise, possible purchasers would lose interest in the shoes. Accordingly, Green has anticipated that PSC would need to spend a lot of cash to purchase[27] the shoes that would constitute an inventory. Over the projection period, this expense fell considerably. This evolution is reflected in Green's projections.

PSC anticipated that sales of Softwalk shoes would become a significant part of its overall sales. In 1998, gross sales attributable to Softwalks were expected to increase by $10 million over two years once the line was introduced. *See* dissenters' exhibit 35. Green's projections have accounted for this, as shown in the increase in sales from 2000

---

[27] Several years prior to the acquisition, PSC had completely ended its role as a shoe manufacturer and instead "outsourced" its products, meaning that it had foreign manufacturers fabricate and assemble the shoe components, which were then brought into the United States and sold by PSC under its label.

(when Softwalks were going to be made available to the public) to 2002. Green forecasted continuing increases in sales volume beyond that time.

Approximately one week prior to the issuance of Advest's fairness opinion, Green had prepared a draft of that analysis. *See* dissenters' exhibit 1. There is a difference in the amounts assigned to non-cash working capital between the two documents. *See id.* at p. 32; dissenters' exhibit 17 at p. 32. Green did not have a particularly satisfactory explanation for those differences, speculating only that during that one week interim he had had further conversations with PSC's comptroller, who provided further information that made its way into the final fairness opinion. That possibility is certainly not out of the question, because the evidence establishes that Green had substantial contact with senior PSC representatives regarding the company's financial condition. Nonetheless, Green's speculation remains just that. On the other hand, there is no meaningful difference in the ultimate assessment of present value as between the draft opinion and the opinion in its final form. Thus, the court does not attach significance to the internal substantive differences between those charts. However, Green's inability to explain the reason why he made those challenges does not escape notice.

Although Green's analysis is not without the general concerns that are inevitable with financial projections that rest on untested product lines, Neveu's analysis of future earnings, *see* dissenter's exhibit 163, is far more problematic. First, he leaves no accommodation for a large inventory. Beyond that, and more importantly, Neveu chose to use an extraordinarily high future growth rate of nearly 40%. To calculate a growth rate, Neveu considered only the cash flow for 1999, as revealed in PSC's historical documents, and then, in order to derive a rate, a portion of the 2000 fiscal year performance. However, little or no reliable information about the 2000 year performance was available as of the valuation date. It appears that Neveu used information that was created after the end of the first quarter of PSC's fiscal year in late February 2000. Because this information could not have been known as of the valuation date, it cannot be the basis for a valuation as of that earlier date.

Further, Neveu disregarded PSC's cash flow from 1996, 1997 and 1998. These omitted data are significant, because in each of those years, PSC suffered net losses, when measured by cash flow. The court accepts Neveu's explanation that his discounted

cash flow model cannot accommodate negative cash flows and, for that reason, he did not consider them. However, this limitation of the model used by Neveu demonstrates why it is inappropriate in this setting. In order to determine a growth rate, Neveu could only use a highly limited and misleading set of data as his foundation and was forced to disregard other highly probative information that, if considered, would have painted a very different picture of PSC's financial standing and growth prospects. For the four years of growth that can be established historically (1996-99), PSC's total cash flow was $567,000. On the other hand, for the next four years (most of the projection period defined by Neveu), PSC would have an actual cumulative cash flow of $17,369,000 – an increase of 3,000%.[28] In the court's view, this is simply not realistic. Rather, as is shown by the *Libby* Court's examination of the subject company's past earnings, 406 A.2d at 65, losses can be considered in determining the value of a corporation. The factual limitations imposed by Neveu mean, in short, that he has not "cover[ed] a sufficient period to show the settled condition of things." *Libby*, 406 A.2d at 65, n.11, *quoting* DEWING, THE FINANCIAL POLICY OF CORPORATIONS 376 (1953). "The "quality of the projection as to the future benefits over some period. . .is central to the reliability of the underlying methodology of the discount cash flow method." *Radiology Associates*, 611 A.2d at 490. The quality of the foundation for Neveu's projections, because it is limited in time and selective in data, is poor.

Neveu recognized that a growth rate of nearly 40% was not sustainable. Therefore, in order to avoid an analysis that was predicated on such a growth rate, he steadily decayed that growth rate by 10% per year and, after five years, projected no growth at all. The court finds that this reduction or decay in the initial growth rate is arbitrary. Neveu testified that he is unfamiliar with the growth rate in the footwear industry but has a "vague" understanding that the industry is not characterized by strong growth, except in the sneaker market, which would not include PSC. Instead, the court

---

[28] On this point, Neveu testified that the proper basis for comparison would be the actual past earnings generated between 1996 and 1999, and the present value of future earnings between 2000 and 2003. However, the point of this comparison is to determine what the actual earnings were and will be for similar periods of time, rather than how much those future earnings are worth in present dollars. Nonetheless, even if the comparison were based on the present value of those future earnings, the increase would be more than 2,000%, and the conclusion from this exercise is just as pointed.

views Neveu's use of a declining growth rate as an adjustment that is obviously triggered by an incorrect starting point: an initial growth rate that is not reasonable or realistic.

This issue has another consequence of significance. Because Neveu starts with an excessive growth rate which he then scales back over the course of time, his cash flow projections are front-loaded: although those projected cash flow values increase over time, they are higher in the near term than they should be. The compounded discount rate is less in early years than it is later on. Thus, cash flow figures closer in time to the valuation date are subject to a smaller reduction when discounted to their present values. This creates a cumulative cash value that is higher than the evidence warrants.

For these reasons, based on the totality of the evidence pertinent to the determination of future cash flows, the court finds Green's analysis to be more reliable, and the court uses his forecasted cash flows for the projection period.

### (b) Terminal value

The terminal values (that is, the sum of all earnings following the projection period, reduced to its present value as of the end of that projection period) used by Green and Neveu are remarkably close: Green calculated $23,465,000, and Neveu calculated $24,505,000. For the reasons noted above, the witness' approaches used to reach these figures may have been quite different, but the results are similar.

### (c) Discount rate

Once the amounts of PSC's future cash flow can be assessed for the projection period and then added to the terminal or residual value, then that calculation must be brought back to its present value.[29] As is noted above, the discount rate, when applied to the corporation's future earnings to determine their present worth, is the "interest rate at which the company would have to invest the 'present value' in order to have the projected future value at the end of the projection period." *Steiner*, 5 F.Supp.2d at 1132. Putting it another way, the discount rate is the rate of return necessary to persuade an

---

[29] Note that this means that the post-projection period future cash flows are discounted for present value two times: first, to determine the value of those cash flows as of the terminus of the projection period, and then second to establish the present value of that future value. *See, e.g., Steiner*, 5 F.Supp.2d at 1130. Because this amounts to a bifurcated discount in order to account for two separate periods of time, it does not result in a repetitive or overlapping reduction.

investor to participate in the flow of future earnings and still assume the risk associated with that investment. Here, Neveu arrived at a discount rate, which he properly described as a cost of capital, *see Steiner*, 5 F.Supp.2d at 1132, of 15.51%. Advest and Green used a rate that started at roughly 20%.

Because a discount rate is a measure of assessing the risks of investing, the relative level of risk associated with that particular investment must be recognized. Both Green and Neveu took PSC's small size into consideration.[30] Even beyond this, however, the risks generated by the unique characteristics and condition of the subject corporation must be taken into consideration. This particularized risk assessment is accomplished though the use of beta, which quantitatively embodies the company's individual level of investment risk in relation to the market in general. *Steiner*, 5 F.Supp.2d at 1134. As the witnesses explained, a beta factor of 1 is equivalent to the level of risk in the market as a whole. *See also id.* A beta in excess of 1 represents a greater level of risk than the market poses. Thus, a higher beta creates a higher discount rate and a smaller present value because of the greater level of risk associated with that investment. The beta is then applied to the amount of risk that the market poses generally, in excess of investments that are deemed risk-free.

Unfortunately (and surprisingly), despite the fact that the identification of beta is an important step in the process of determining a discount rate, at trial Green was unable to state the beta that he and Advest used to arrive at their discount rate of roughly 20%. He was able to testify, however, that it was a higher beta than the one employed by Neveu. The difference in the resulting discount rates used by those witness supports that general observation. Neveu used a beta of 0.5. This means that he created a discount rate on the premise that an investment in PSC posed half of the systematic risk that an investor would encounter in an alternative investment with the characteristics of the Standard and Poors index. The court finds that this beta is too low to adequately reflect the risk of investing in PSC and that the beta used by Green and Advest – whatever it may have been – is better suited to PSC, for the very reason that it was higher than 0.5.

---

[30] Outside authorities on corporate valuation endorse the use of a small company risk discount or premium when determining a discount rate. However, as is discussed above in connection with the market comparable approach, this factor cannot be properly injected in a corporation-to-corporation or stock-to-stock comparative analysis.

Industry sources have established betas for many publicly traded corporations. PSC, however, was not one of them. In light of that problem, Neveu used the beta that represents the footwear industry as a whole. The court finds that this is an analytical flaw that calls all subsequent steps into question. The trial record clearly establishes that PSC was a very small corporation in terms of its capitalization, sales or any other relevant measure. PSC was a participant in what Kagan described as a "very tough industry." Further, until Softwalk came along, its market presence was remarkably undiversified because it had only one line of shoes (with some cosmetic variations within a very limited range). Softwalk was to be PSC's second product line, but as of the valuation date, it was utterly untested. There was legitimate concern that Softwalk might appeal to existing Trotters customers, thereby damaging sales of Trotters. If Softwalk proved to be successful, then PSC would have the economic benefits of that alternative commercial draw. On the other hand, PSC had made a substantial financial commitment to the new Softwalk line, as is demonstrated by the high level of non-cash working capital allocated by PSC in and shortly prior to 1999, and as evidenced by the additional non-cash working capital that Green reasonably projected for 2000 and beyond. With high expectations for and commitment to a new product, the risk grows commensurately.

The discount rate created by Advest and used by Green incorporated the varying levels of risk associated with the two product lines: the market risk for Trotters was relatively low because it was well-established (although it had not been sufficient to allow PSC to break out of it historically small market share), while the risk for Softwalk was higher because it was unproven. Advest took into account these disparate factors and blended them. Compared to Neveu's analysis, this approach is more sensitive to PSC's particular condition.

In this context, it is also important to recognize the historical patterns of earnings discussed above as part of the factual background leading to the acquisition. As Kagan succinctly stated, despite innovations, persistence, and a high level of attentiveness and responsiveness to market conditions over many years, PSC had never been able to break out of a well-defined range of earnings. Indeed, some thought had been given to liquidation of the company several years prior to the board's decision to seek a buyer. The company's situation was made more difficult because of the unexpected death of its

president in late 1998. Although a leadership structure was created, this was not a long-term solution. *See* dissenters' exhibit 6 at p. 4 (minutes of September 7, 1999, PSC board meeting, referring to Kagan's "temporary status as acting CEO. . ."). Kagan was willing to serve as an overseer of a triumvirate of management personnel, but he also had decided not to re-immerse himself into the business' day-to-day operations. *See generally* note 6 *supra*. This is a circumstance that bears on risk.

As Neveu himself recognized when testifying about the company's growth rate, PSC is not typical or representative of the players in the footwear industry. Nonetheless, Neveu used a risk factor is that is typical within the industry.[31] From this, the court concludes that a beta of 0.5 is not a fair assessment of the investment risk that was found in PSC, when that beta is measured against the industry or against the Standard and Poors index, which consists of large and well-diversified concerns.[32]

This issue is one of consequence. Using the security market line formula underlying Neveu's calculations of the discount rate, *see* dissenters' exhibit 161, if the beta for PSC were increased only from 0.5 to 1.0 (the level of risk associated with S & P), then the resulting discount rate is 18.8%, which is comparable to the rate used by Advest and Green.

The dissenters note that Advest once used a discount rate of 12% for PSC. *See* dissenters' exhibit 46 at p.9. This, however, was part of the "pitch document" that Advest used when the PSC board was considering several investment banking firms,

---

[31] In attempting to defend his use of a 0.5 beta, Neveu testified to several published betas for other footwear companies. Because those figures were published in 2002, they cannot be used here as part of an analysis to determinate a valuation as of January 2000. Thus, the court disregards that evidence.

[32] The *Steiner* court noted some factors that it used in determining a proper beta. There, the court relied on evidence that the subject company was risk-averse, that it had a "well-diversified client base," that a long history of steady growth, that it was an attractive borrower, and that it was a large company. 5 F.Supp.2d at 1134. Rejecting the argument that the corporation was "a risky little private company beset by various financial problems," the court assessed a beta of 0.75. *Id.* Here, to the extend that general comparisons may be drawn, those factors would make PSC seem a riskier proposition than the company examined in *Steiner* because, although PSC was managed conservatively and was a favored borrower because of its securities portfolio, it was small, it had never achieved steady growth and it was in a very difficult industry.

including Advest, to represent its interest in these sales efforts. It certainly does not reflect well on Advest or Green that they offered what appears to be a serious financial analysis on the basis of numbers that Green later rejected as "preposterous" at trial. However, even Neveu's proffered discount rate is not that low. More importantly, the reliable evidence presented at trial demonstrates that the beta used by Neveu and the discount rate he reached on the basis of that beta are too low, and that the beta is best represented by a higher number.

The court readily acknowledges that this analysis less than completely satisfactory because the record does not disclose the beta used in the Advest/Green calculations. However, it is known that the beta used in the fairness opinion is higher than that used by Neveu, and the beta used by Neveu is problematic because, when seen in the light of extrinsic circumstances, it is too low. Therefore, to this extent, the record does allow an assessment of the relative merits of the competing positions. Thus, the record reveals that the better calculated present value of future cash flow, including the terminal value, is $12,618,000.

### (d) Value of non-operating assets

The final step of the valuation method based on discounted cash flow is to account for the value of non-operating assets. Green and Neveu have differing opinions on the value of those assets. Those assets are in three forms: cash, marketable securities and an overfunded pension account.

First, Neveu concluded that PSC had cash reserves of $1,713,000. Of this, he concluded that PSC would need $500,000 as operating capital and that the balance was therefore excess. Neveu acknowledged a measure of arbitrariness in this allocation. However, even setting this problem aside, the evidence does not support this cash total figure. The most reliable source of information for PSC's financial condition as of the valuation date is the company's annual financial report that shows its cash condition as of the end of its fiscal year in late 1999, roughly one and a half months prior to the valuation date. As of then, PSC had $504,000 in cash and cash equivalents – the amount that Neveu opined PSC needed for its ongoing operations. *See* dissenters' exhibit 178 at p. 2. Instead, Neveu apparently used a projected balance sheet that indicated that at the end of the 2000 fiscal year (the end of November 2000), PSC would have cash of $1,728,000.

*See* dissenters' exhibit 248. Even if this document had been in existence or the information available as of the valuation date, the datum used by Neveu is not probative of PSC's cash reserves at the relevant time. In fact, that balance sheet suggests that PSC had *no* cash reserves during the first quarter, which is when the valuation date fell.

The end of year financial report shows that PSC's marketable securities had a value of $3,985,000 as of late November 1999. There is no evidence that these assets constituted working capital that meaningfully contributed to PSC's ability to conduct its business.[33] Rather, the assets were a form of financial security but not the basis for earnings.[34] Both Green and Neveu treated these securities in this manner.

In the fairness opinion, Advest used a value ($4,342,000) for non-operating assets that existed as of the end of PSC's third quarter, which fell at the end of August 1999. Although the end of year figures were available on the valuation date and, obviously, at the time of trial, Green did not attempt to make any adjustment of the figures used in the fairness opinion. The court infers that Green saw no importance in any such adjustment, and the court follows suit. It should be noted, however, that although the value of PSC's investment portfolio fell during the fourth quarter, the amount its debt rose. The net effect is thus quite small. Nonetheless, the court accepts the value of PSC's non-operating income as used by Advest, and this amount must be added to the present value of the company's future earnings.

Finally, PSC had accumulated a pension plan that became overfunded. Fully aware of that situation, PSC management explored the alternatives presented by that situation. Those alternatives included eliminating future pension contributions from employees, enhancing benefits and refunding a portion of the overfunding to the employees. In the end, PSC elected to maintain the account, eliminate employee

---

[33] PSC's comptroller testified that these investments provided some benefit to the company's business because they gave the company some leverage in its financing arrangements. However, it does not appear that this feature of the company's assets were central to its operations and, in any event, both Green and Neveu have treated these securities as non-operating capital.

[34] One court has noted that substantial cash assets reduce the value of a corporation because cash assets generate little or no earnings, thereby reducing the investment appeal of that concern. *Gibbons*, 339 A.2d at 465.

contributions and enhance benefits. The overfunded amount was not included among the company's assets on its balance sheets. PSC's investigation made it clear that due to excise taxes and other consequences, the company stood to gain very little – perhaps 10% of the overfunded amount -- by liquidating the account. This meant that the overfunded account was more valuable to PSC (and to any potential buyer of PSC) as an asset directly involved in its personnel operations. Therefore, the court declines to treat all or part of PSC's overfunded pension account as a non-operating assets whose value should be included separately.

### (e) Conclusion

For the reasons noted above, from the best available evidence, the court concludes that as of the valuation date the present value of PSC's future cash flow was $12,618,000. When the amounts of debt, non-operating assets and reasonably anticipated stock option proceeds are considered, PSC's total implied value was $16,654,000, or $11.86 per share.

As the court has noted in this discussion, the process that leads to this conclusion is not without problems. These problems do not undermine the probative value of the conclusion but rather must be borne in mind when it comes time to determine how much weight should be given to that value.

In assessing the weight to be given to the opinions of the two valuation experts, the court has considered the issues of credibility and qualification that the parties have raised. This is particularly true with respect to court's analysis of the discounted cash flow model, which is where the witness' opinions diverge most sharply. On several issues, the dissenters' arguments regarding the credibility of Green and of Advest, when its institutional role in the acquisitions is examined, have shaped the court's findings and conclusions. For example, as is noted below, the court is convinced that the dual roles played by Advest in the PSC-DGC merger amounted to a conflict, either in appearance or reality. Advest's interest in seeing the transaction through to consummation, thereby generating a significant success fee, was inimical to its more dispassionate responsibility of providing the PSC board with an objective assessment of whether it should accept the terms offered by DGC. Although the testimony reveals that it is not uncommon for the marketing entity to also provide a fairness opinion, that practice does not liberate the investment banking firm from, at the very least, the appearance of competing goals.

50

Based largely on this factor, although in combination with several others, the court attaches no weight to the PSC board's decision to accept the terms of the tender offer, notwithstanding commentary from a secondary source that those terms, when accepted by a board, are presumed to represent the fair value of a corporation, and places on the dissenters the burden to prove the contrary by clear and convincing evidence. *See* PRINCIPLES OF CORPORATE GOVERNANCE, *supra*, § 7.22(b).[35] Also, as is noted in this order, the court is troubled by, among other things, Green's transition between references to illiquidity discounts and a small business risk discount, by the evidentiary absence of analytical support for the use of a small business risk discount, and his inability to cite the beta used by Advest in fashioning a discount rate that is central to the discounted cash flow analysis. Because of these problems, the court has rejected the use of a small business risk discount has reduced the weight that the court gives to the results of Green's analysis based on this approach.

While recognizing these and other legitimate challenges that the dissenters have pursued, the court also has considered Green's opinions on their merits. The court has found circumstances, such as those noted above, that affect the weight and reliability of evidence. Nonetheless, where the opinions offered by Green are shown to have support in the evidence and rest on reasoning that appears to be sound, the court is willing to give weight to those observations and conclusions.

The court has engaged in the same type of scrutiny for the analysis presented by Neveu. As is noted above, for example, his relative lack of familiarity with the footwear industry weakens some aspects of his opinions. Further, his efforts at valuation were less broad than those of Green and Advest because he considered only two related models. Thus, although his academic credentials are more extensive that Green's, the more narrow scope of his inquiry affects the overall weight that his opinions warrant. Finally, it became evident during the trial that to a significant degree, Neveu relied on information

---

[35] These standards and burdens of proof suggested by ALI, which none of the parties has advocated, are different than those adopted here. Instead, the court has adopted the allocation and standards of those burdens flowing Delaware caselaw, which has been influential in the development of this area of law in Maine. The court notes the ALI recommendations only to point out the views of some commentators regarding the evidentiary effect of a board's decision and the significance of the evidence that the court has rejected here.

that did not exist or was not reasonably available as of the valuation date. For the reasons discussed earlier in this order, the court concludes that this is not a proper way to establish valuation as of a date certain (here, January 17, 2000). This analytical flaw affects the weight to be given to his analysis generally, and it also put Neveu in a position where, during trial, he had to engage in some *ad hoc* calculations to reconstruct the basis for several of his opinions. This clearly detracted from his presentation.

In short, the court has considered the many points made by all of the parties regarding the credibility and competence of the designated opinion witnesses. The conclusions reached by the court therefore rest in part on these considerations.

### 5. Market value: comparison of PSC to recently sold publicly held corporations

As part of the valuation efforts of Advest and of Green, PSC was gauged against comparable companies that had been acquired recently. This valuation technique, which is analytically similar to the market comparable approach discussed above, is considered to be legitimate. *See* Eisenhofer at p. 119. The question of whether a transaction involved a legitimately comparable company rests on such factors as the time when the transaction occurred, the size of the transaction, and the industry or field in which the acquired comparable is a participant. *Id.*

Here, although the characteristics of the comparable companies cover something of a range, the dates of those comparables acquisitions are within several years of the PSC-DGC merger. The most dissimilar comparable was involved in an acquisition that occurred within 6 months of the valuation date at issue here. This means that the transactions that are more remote in time involve companies that bear structural and operational similarities to PSC, and the transaction with the least similar company occurred close in time to the date of importance here. Thus, when these factors are placed in balance, the court concludes that the blended comparisons are probative of PSC's own value.

Green used the same comparative process implicated in the market comparison approach noted above. Relying on TEV multiples associated with sales and EBITDA, Green derived a range of value for PSC stock of between $13.70 and 19.90. For the same reasons that are germane to the comparison analysis involving similar companies

discussed above, the EBITDA figure used by Green must be increased by $863,000 to account for extraordinary and nonrecurring expenses. When the EBITDA multiple of 7.1 is applied to that increase, the result is an additional $4.36 per share ($863,000 x 7.1/1,404,000). This suggests a calculated value per share of $24.26, based on the EBITDA multiple. No change in warranted on the sales multiple because PSC's gross sales figure had not been reduced by the amount of its extraordinary and nonrecurring expenses.

With this valuation analysis, Green did not apply a control value premium to that initial calculation. That premium is unnecessary (and, in fact, inapplicable) because the measure derived here is of a control block of the acquired company. In contrast, the multiple flowing from the market comparison approach was based on a minority position in the comparable company. Because of that fact, an adjustment was needed because PSC was sold as an entity. Therefore, in the acquisition comparable model, Green correctly did not apply a control premium.

As with the market comparable approach, however, Green applied a small company risk discount to the value of PSC shares derived directly from the comparables' multiples. For the identical reasons set out above,[36] on this record, PSC has not established that the small business risk discount constitutes a proper adjustment to the value of PSC shares as derived directly from multiples. Therefore, the value of PSC shares computed on the basis of comparable acquisitions, but without the small business risk discount, is between $13.70 and $24.26. *See* dissenters' exhibit 17 at p. 27. The court chooses the midpoint, namely, $18.98, as the result of this analysis.

### 6. Damodaran price/sales model

In addition to the discounted cash flow model, Neveu also considered the fair value of PSC, and thus of PSC shares, on the basis of the Damodaran relative valuation model that examines the price of PSC shares as a function of its sales. Under this

---

[36] In its October 1999 fairness opinion, Advest used the identical explanation to support its application of the small business risk discount as it did with the market comparable analysis. *See* dissenters' exhibit 17 at p. 26. This included the same reference to "widely accepted studies" supporting the use of a small business risk discount and which Green was unable to cite during his testimony both at his deposition and trial.

approach, earnings per share are calculated for a period of several recent years (Neveu used historical performance data for 1996-99 and projections for 2000), and, based on the same cost of capital used in the discounted cash flow analysis and growth rates derived from historical data, a price per share is calculated for the projected 2000 earnings. On the basis of that approach, Neveu arrived at a value per share of $25.28. *See* dissenters' exhibit 162.

Because of several substantial flaws in the application of this model to PSC, the court concludes that the approach does not have sufficient reliability here to support its inclusion in the valuation exercise. First, Neveu himself testified that of the two intrinsic value methods he used in this case, the discounted cash flow method is the more reliable. However, for the reasons noted above, the court does not have confidence in that analysis or its results as Neveu has applied it here. Thus, if the Damodaran model is even less reliable than the discounted cash flow method, then it deserves no weight at all as applied in this case.[37]

Second, the ultimate step in Damodaran's analysis is to apply a price/sales ratio to projected sales revenues, calculated on a per share basis, for a certain year. Here, Neveu applied that ratio to projected sales for 2000. Neveu himself acknowledged, however, that those 2000 sales projections were based on data for the first quarter of PSC's 2000 fiscal year. That quarter ran from late November 1999 to late February 2000. The valuation date here is January 18, 2000. Thus, the data that formed the core of Neveu's calculations were not in existence as of the valuation date. For the reasons discussed above, the valuation of PSC must be established on the basis of information that was in existence as of the valuation date. It also bears note that the gross sales figure in excess of $32 million that Neveu projected for 2000 is in a different league from any annual earnings that PSC had ever generated. While sales projections should not be based entirely on an extrapolation of historical performance, *Steiner*, 5 F.Supp.2d at 1030, one must keep an eye toward the realities of the industry and, at least in a general way, the capacities demonstrated in the past by the subject corporation, Thus, despite Neveu's

---

[37] Neveu and Green disagree whether the Damodaran analysis is proper for valuation purposes. That question need not be resolved in light of Neveu's own general assessment about the relative degree of reliability that might be attached to this methodology.

efforts to reconstruct his calculations on the basis of data that pre-dated the valuation date, the court concludes that the foundation for the Damodaran analysis as applied here is analytically flawed for that reason.

Finally, the long-term growth rate that Neveu calculated and then applied is subject to real doubt. Neveu calculated that rate to be 13.31%. This represents the rate of growth that PSC would be expected to sustain indefinitely. That growth rate is one variable used to determine a price/sales ratio. As Green pointed out during his testimony, because of the way the growth rate is included in the equation used to determine that ratio, the quantification of that long-term growth rate has a huge impact on the result. In the Damodaran equation, the denominator is reduced by the long-term growth rate. If the long-term growth rate is pegged too high, then the price/sales ratio is also too high, and the resulting value per share is similarly affected. Here, a perpetual 13.31% growth rate would be extraordinary, substantially outpacing the economy as a whole and the footwear industry in particular. Damodaran himself finds a growth rate for the footwear industry at roughly half the rate that Neveu assigns to PSC. For the reasons set out above, PSC's historical inability to break out of its well-established cyclical pattern of sales performance and the significant problems afflicting the footwear industry surely do not support the rosy promise of an ongoing annual growth rate of 13%. If the industry's growth-rate of roughly 7% were used, then the price-sales ratio would fall by a factor of more than 3, from the .9238 calculated by Neveu to .259.[38]

Without the need to address other issues regarding the data that Neveu used as a foundation for his price-sales relative valuation model, the court concludes that as applied in this case, it is not sufficiently reliable to be included as a basis for the valuation of PSC.

### 7. Market value: price of tender offer

PSC argues that the circumstances leading to the tender offer, and the board's decision to accept DGC's tender offer, constitute evidence that those terms reflected PSC's fair value. *See M.P.M. Enterprises, Inc.*, 731 A.2d at 797. There clearly is some

---

[38] Using Damodaran's formula found in dissenters' exhibit 162, the calculations would be as follows: 2,131/21,665 x 15.76 x 1.425 / (15.51 − 7).

55

evidence to support this observation. The transaction between PSC and DGC was arms-length and free of evidence of collusion or other malfeasance. Advest had conducted a reasonable search for possible buyers. Although the two firms that extended purchase offers (DGC, through PSC Acquisition Corp., and Valley Lane) came into the process by means other than Advest's efforts, Advest had identified both of those firms as potentially interested parties. *See* dissenters' exhibit 72. It is therefore reasonable to infer that if they had not expressed an interest in purchasing PSC under the fortuitous circumstances surrounding that expression, then Advest would have made contact with them in the normal course, just as it did with fifty or more other concerns that Advest felt might be attracted to PSC. Further, the limited response to PSC's availability, despite Advest's reasonable marketing efforts, is noteworthy. Finally, a central reason why PSC became available for acquisition was Kagan's interest in liquidating his interest in the company. *See* dissenter's exhibit 212 at p.6.[39] However, the evidence demonstrates that Kagan was not willing to sell his interest at any price. If that had been the case, he would have been inclined to accept – or even give thought to – Reidman's offer to acquire the shares that he and his family owned. Instead, Kagan rejected that proposal out of hand because he felt it would not promote the best interests of PSC's other shareholder.

Despite these factors that support PSC's theory that the tender offer price itself should be given weight in the fair value analysis, there is meaningful evidence to the contrary. First, the court must consider the converse of the circumstance just noted: although Kagan was vigilant to the interests of PSC's shareholders, the fact remained that he wanted to sell his shares. As he said during a conversation with Nerges and with another member of PSC's top management, he (Kagan) would not have been an advocate for the sale of PSC earlier in his career. The court takes this comment to mean only that

---

[39] Dissenters' exhibit 212 is a confidential memorandum that Advest used in its efforts to market PSC. Among other things, that document provides information about the background of and reasons for the prospective sale. The document notes Kagan's personal interest for liquidating his position with PSC and also notes that PSC then had a strong management team, therefore making the company an attractive prospect for acquisition. This latter consideration does not appear to be a reason why Kagan and the board hoped to secure a buyer for PSC in the first place. Rather, it is significant because it signifies that PSC was in a sound managerial condition, which could increase the price that a buyer would be willing to pay to acquire the company. Thus, the quality of management relates more to the timing of the sale rather than to the reasons for it.

Kagan's estate and financial planning objectives would not have motivated him to sell his interest in PSC at a different time in his life. Nonetheless, Kagan's candor reinforces the point that he made a different type of decision than he would under circumstances when he was not as eager to liquidate his position with PSC.

Second, Advest (represented by Green) met with the PSC board on September 7, 1999. As of that date, DGC had made an offer to purchase PSC stock at the tender offer price of $11.75. The purpose of the September 7 meeting was to provide Advest with an opportunity to advise the board, at least preliminarily, of the merits of DGC's offer. In fact, Green recommended to the board that it continue to pursue a possible sale to DGC. That recommendation was based in part on a liquidity discount. *See* dissenters' exhibit 122 at pp. 10, 11 n.2. For the reasons noted above, this is an improper factor in the valuation analysis under Maine law if such a discount is limited to minority holdings. During all times that are relevant to this case, Kagan and his sister collectively owned a majority of PSC shares. Thus, the shares that were traded were necessarily within a minority block. Therefore, the market conditions that limited the liquidity of shares affected only those minority shares. Advest also advised the board that, in its opinion, the tender offer of $11.75 represented fair value "given today's market conditions. . . ." *See* dissenters' exhibit 122 at p. 9. These aspects of the opinion that Advest relayed to the PSC board were therefore framed heavily in terms of the market performance of PSC stock.

Advest subsequently presented the board with its formal fairness opinion at a meeting held on October 6. As is discussed above in reference to the market comparable valuation method, Advest by then had eliminated any reference to liquidity discounts in its opinion. *Compare* dissenters' exhibit 122 at pp. 10, 11 n.2, *with* dissenters' exhibit 17 at p. 19. Advest expressed its opinion that a tender offer price of $11.75 per PSC share was fair. The board members unanimously agreed to accept the offer.

In making that decision, the board considered the following factors: "[c]urrent market conditions, the relationship between the consideration to be received by stockholders in the Offer and the Merger on the one hand and the historical and recent market price for the shares on the other hand, and the fact that the market for the shares was very illiquid, thus restricting the ability to sell shares at current market prices." *See*

57

dissenter's exhibit 176 at p. 12 (par. (ii)). The board considered a number of other factors but declined to assign relative weight to them; rather, the board considered the "totality of the information presented to it and considered by it," which, of course, would include Advest's fairness opinion. *See id.* at p. 13. At least for purposes of the fair value analysis that constitutes the core of this case, the liquidity discount applicable only to a minority block of shares is an improper factor. Such a discount may even be improper when applied to the corporation as a whole. *See Borruso*, 753 A.2d at 460. *See generally* note 22 *supra.* The references made by the board to the illiquidity of PSC shares (which, as noted above, most likely refer to the minority shares – those not owned by Kagan and his sister) and to "market conditions" create the distinct impression that the basis for the board's decision, heavily influenced by the content of Advest's presentation, did not cohere with notions of fair value under Maine law. When the tender price accepted by the board is likely to be based in part on valuation factors that have been expressly rejected by the courts, the probative worth of that tender price is called into substantial question.

PSC also argues that the formula for Advest's compensation is evidence that the tender offer price of $11.75 represents fair value. The tiered levels of compensation certainly provided Advest with a stronger financial incentive to secure the highest available offer than if the percentages declined relative to higher offers. However, PSC's argument ignores the reality that despite Advest's reasonable efforts to find buyers for PSC, DGC was the only party that PSC took seriously. With no other prospects on the horizon, Advest's own interests would have been best served if PSC accepted the tender offer of $11.75 – which, of course, it did. Although a higher tender offer would have accrued to Advest's self-interest because of a proportionately higher percentage of its success fee, there were no other prospective buyers, and negotiations with DGC had settled in the range within which the actual tender offer fell and therefore did not create an expectation that DGC could be persuaded to increase its offer meaningfully. Thus, in the abstract, if Advest's recommendations were premised on the amount of its compensation, then it would not be expected to recommend something less than fair value. In reality, however, if PSC accepted the offer that it had in hand, then Advest would also have the certainty of a considerable success fee, which would be more

attractive than the prospects of rekindling a search for other possible buyers. Thus, the scaled terms of Advest's compensation do not support a realistic argument that Advest would have counseled against DSC's offer if it was below fair value.

In some circumstances the tender offer price may be treated as a legitimate factor in assessing a corporation's fair value. Indeed, it has been noted that "the institutional competence of a disinterested board in valuation will normally exceed that of the court." PRINCIPLES OF CORPORATE GOVERNANCE, *supra*, § 7.22, comment d. This court has no quarrel with that general observation. However, based on evidence regarding this particular transaction, the court concludes that Advest's decision to commend the tender offer of $11.75 to the board, and the decision of the PSC board to accept that tender offer of $11.75 were not rendered under circumstances that entitle that price to valuation weight.

For that reason, the court also rejects the dissenters' argument that the price of PSC stock near the time of the board's October 1999 decision is evidence that the tender offer price was inadequate. During the period of time leading up to the events of late 1999, the price of PSC stock had been rising rather steadily. *See generally* dissenters' exhibit 172 at pp. 4-5. In fact, this circumstance was the subject of some discussion among representatives of PSC and Advest. Advest expressed its feeling that this rise in price might have been caused by speculation about a possible merger, which would make the ownership of PSC shares more attractive. In light of the historical limits of the value of PSC stock, that possibility cannot be overlooked. Further, fair value cannot be determined on the basis of "any appreciation or depreciation of shares in anticipation of" the corporate transaction. 13-A M.R.S.A. § 909(1). Thus, the increased price of PSC shares during this time does not bear on the fair value of those shares.

The dissenters have argued that PSC was particularly attractive to DGC because of evidence that the latter was experiencing financial difficulty at the time of the acquisition. From this, the dissenters contend that what they view as PSC's financial strengths, including its earning prospects, could be offset against DGC's losses and that this synergistic effect is relevant to valuation. However, even assuming that the evidence supports these observations about the condition of the two companies, these corresponding attributes of these two particular companies would result in a "special

benefit[] to be derived by the acquiring company" and thus, under *Libby*, are not a proper consideration for this valuation analysis. 406 A.2d at 62.

### 8. Assessment and weighting of valuation methods

At this point in the valuation analysis, the court "must assess the relative deficiencies of the. . .[valuation] elements and. . .arrive at a weighting scheme which . . .would best reflect the 'fair value' of the dissenters' shares." *Libby*, 406 A.2d at 61.

The court's examination of the valuation models applied to this case follows the framework of the burden allocation discussed at the outset of this order. With respect to each particular model, the court has considered the quality of PSC's valuation evidence and then that of the dissenters. Of the various valuation methods that were implicated by the evidence in this trial, only three of them have sufficient reliability to warrant inclusion in the final weighting process. In the court's view, the others, for the reasons set out above, suffer from flaws that are significant enough to prevent them from shedding light on the value of PSC as an entity.

The three methods that do have probative value in this final analysis are (1) PSC's market value based on comparisons between PSC and other similar publicly traded companies;[40] (2) PSC's discounted future cash flow value; and (3) PSC's market value based on comparisons between PSC and similar publicly held corporations that have been sold recently.

In determining the relative weights to be assigned to the results of these three valuation methods, it is helpful to note that the discounted future cash flow approach is sometimes regarded as favored. *Cede & Co. v. Technocolor, Inc.*, 1990 Del.Ch. LEXIS 259, at *23-24 (Del.Ch. Oct. 19. 1990), *rev'd on other grounds*, 758 A.2d 485 (Del. 2000) (noting that "in theory" the discounted future cash flow model is the best technique); *see also* PRINCIPLES OF CORPORATE GOVERNANCE, *supra*, § 7.22, Reporter's Note 1. The weight that this valuation result might otherwise deserve is weakened because as of the valuation date, the amount of PSC's future earnings was much more difficult to forecast due to the imminent introduction of an entirely new product line to supplement the single existing line. Evidence of value based on this model is also

_____

[40] Again, the *Libby* Court described this as the "investment value" model.

weakened because Green was unable to provide some basic information about the analysis created by Advest and on which he now relies. However, for the reasons noted above, this valuation method is an important one in this case for at least three reasons. First, a meaningful part of the analysis is in fact supported by direct or indirect evidence. Second, from a more conceptual perspective, it rests on a forward-looking projection, providing a useful counterpoint to the two market models that have survived to this part of the overall valuation analysis. Third, the discounted future cash flow analysis bears directly on the essence of this valuation exercise: to assess the merits of a present investment, which, by definition, is the acquisition of a right to enjoy future benefits.

The other two remaining valuation methods are conceptually similar to each other: both rest on a comparison between PSC and the other companies in two settings. The strength of these two comparative approaches is the historical foundation that suffers less from the uncertainties of forecasting that is central to the discounted future cash flow analysis. These models also are useful in conjunction with the cash flow model because of the very different analytical approach. Thus, the comparative approaches are a sound complement to the internal, projective analysis of the cash flow approach.

In light of these considerations, the court concludes that the discounted future cash flow valuation results should be given equal weight to the combined valuation results derived from the two comparative models. In this way, the forecasting model has the same value as the historical, comparative model. However, because two comparative models are used here, their combined effect should not outweigh that of the discounted future cash flow approach. This weighting scheme reveals the following result:

| | |
|---|---|
| (1) PSC's value based on comparisons between PSC and other similar publicly traded companies | $20.76 x 0.25 = $5.19 |
| (2) PSC's discounted future cash flow value | $11.86 x 0.50 = $5.93 |
| (3) PSC's value based on comparisons between PSC and similar publicly held corporations that have been sold recently | $18.98 x 0.25 = $4.75 |

61

Total (fair value per PSC share)          $15.87

As of the valuation date, the fair value of Joseph Nerges' 133,300 shares was $2,115,471.00; the fair value of Robert McCullough's 12,000 shares was $190,440.00; and the fair value of Anne Buta's 3,000 shares was $47,610.00.

### D. Interest

Title 13-A M.R.S.A. § 909(9)(G) requires that a judgment entered in a dissenting shareholder action "include an allowance for interest at such rate as the court may find to be fair and equitable in all the circumstances. . . ." Unlike prejudgment interest in cases governed by the provisions of 14 M.R.S.A. § 1602, where the purpose of prejudgment interest is to motivate the parties toward "expeditious litigation," an assessment of interest here is a "substantive right, intended to reimburse the Dissenters for the lost use of their money during the pendency of the appraisal proceeding while the corporation retained control and use of it." *McLoon*, 565 A.2d at 1007. However, the interest rate applied to a judgment in this type of case need not match actual interest rates in the market. *Id.* at 1006.

The evidence in this case has revealed several useful concepts and touchstones on the issue of interest. First, risk is relevant to establishing a rate of return. Second, the interest rate of a risk-free investment is roughly 6.5%. *See* dissenters' exhibit 161. Third, an investor would expect an annual rate of return of roughly 15% from an investment that shares the characteristics of those companies represented in the S & P. *Id.* Fourth, PSC itself has shown that an investment in PSC would be riskier than one from which investors would require a 15% return. Finally, during the pendency of this action, the statutory rate of prejudgment interest, which the *McLoon* referee properly considered, 565 A.2d at 1006, was fixed administratively at 8.0%.[41] Until that

---

[41] That decision was made in December 2002 by the Chief Justice of the Superior Court and was responsive to uncertainty created when the District Court's jurisdictional limit of $30,000 in civil actions was legislatively repealed. Accordingly, as of December 16, 2002, prejudgment interest was set at 8% except in those cases based on a contract or note that included a set term of interest. Because prejudgment interest is determined by the prevailing rate as of the month a judgment is issued, *see* 14 M.R.S.A. § 1602(1)(B), that rate would apply here if this case were governed by section 1602.

administrative policy went into effect, prejudgment interest as calculated under 14 M.R.S.A. § 1602(1)(B) ranged from a high of 6.375% (June-August 2000) to a low of 1.46% (November 2002) during the pendency of this case.

Here, by court order, DGC elected to purchase a bond to secure payment to the dissenters in an amount equal to the value of their shares calculated at the tender offer price. While that bond has been in effect, the shareholders presumably have not been exposed to risk on the amounts guaranteed by the bond.

Based on the totality of these factors, the prejudgment interest rate shall be 8% compounded annually. Although an interest rate of 8% does not reach the level of market rates for an investment that includes some element of risk, it need not do so. Additionally, notwithstanding the difference between the purposes of section 1602 prejudgment interest and prejudgment interest in this case, the rate applicable here should not be lower than the rate that applies elsewhere. The rate available under section 1602 is designed to encourage attentiveness to the litigation at hand. In other words, the rate set in that statute, either directly or by means of a formula, reflects a judgment that such a rate is necessary and sufficient to encourage "expeditious litigation." From that, it follows that if the rate of prejudgment interest here were lower than that standard, then one or more parties to this type of action would not be motivated to move the case along at a proper pace. Consequently, the dissenters would be deprived of the use of their money for a longer period of time. Thus, the rate used here, which is also the rate specifically endorsed by the Law Court in *McLoon*, balances the factors noted in that case.

### E. Costs and attorney's fees

Title 13-A M.R.S.A. § 909(9)(H) sets out the standards for assessment of costs and attorneys' fees. The dissenters have made a claim for an award of these expenses. However, up to this point, the parties have not addressed these elements of the dissenters' claims in a meaningful way because, prior the issuance of a judgment, any discussion of these issues would have been premature.

The parties may submit any bills of costs pursuant to the process established by 14 M.R.S.A. § 1501 *et seq.* As part of those submissions, the parties may file argument

on the issue of who may be entitled to an award of costs. Additionally, the dissenters may file arguments and other materials in support of their request for an award of attorneys' fees. Any such submissions on this issue shall be filed within the time allowed for submission of a bill of costs. Any objection, and any subsequent reply to any such objection, shall be filed within the time established for submissions on a bill of costs.

The entry shall be:

For the foregoing reasons, judgments are entered for Joseph Nerges in the amount of $2,115,471.00; for Robert McCullough in the amount of $190,440.00; and for Anne Buta in the amount of $47,610.00. Those parties shall be entitled to prejudgment interest of 6%, compounded annually.

Claims for costs and attorneys' fees shall be submitted through the process set out in this order.

Dated: May 29, 2003

_____
Justice, Maine Superior Court

Date Filed _____ 3/31/2000 _____ PENOBSCOT _____ Docket No. _____ CV-2000-65

10/30/00-JEFF KULICK DISMISSED     County

ASSIGNED TO JUSTICE JEFFREY L. HJELM

Action __STATUTORY ACTION_____

*Dismissed 10/30/00
*9/8/00 HENRY T. JACOBS DISMISSED

Joseph R. Nerges, 1726 Bundy Street, Scranton, Pennsylvania:

Henry T. Jacobs, 2575 Palisade Avenue, New York, New York;

Estate of Sadie Jacobs, 2575 Palisade Avenue, New York, New York;

IN RE: VALUATION OF COMMON STOCK OF
PENOBSCOT SHOE COMPANY

Robert S. McCulloch, III, 335 North Union Avenue, Salem, Ohio;

Anne F. Buta, 663 South Lincoln Avenue, Salem, Ohio; and

Plaintiff's Attorney

*Jeff Kulick, 229 Franklin Street - Fl. 2, Dunmore, Pennsylvania.

RUDMAN & WINCHELL
P O BOX 1401 - 84 Harlow Street
BANGOR ME 04402-1401
BY: Phillip Buckley, Esq.
    Anthony D. Pellegrini, Esq.

CUDDY & LANHAM
470 Evergreen Woods
Bangor ME 04401
BY: Samuel Lanham, Esq.
FOR: Robert S. McCulloch, II and

Gilbert & Greif, P.A.
82 Columbia Street, PO Box 2339
Bangor, Maine 04402-2339
BY: Charles E. Gilbert III, Esq.
FOR: Respondent Joseph R. Nerges
Anne F. Buta

| Date of Entry | | |
|---|---|---|
| 3/31/00 | | tached. |
| 3/31/00 | WOODS OVIATT GILMAN LLP 700 Cross Roads Bldg. 2 State St Rochester NY 14614 BY: William Smith, Jr. Esq. FOR: Penobscot Shoe Co. | arded to Plaintiff's counsel. |
| 4/21/00 | | Anne F. Buta, Pro se. |
| 4/21/00 | | Pro Hac Vice Robert S. McCulloch, III, Pro se. |
| 5/4/2000 | | seph R. Nerges Filed. |
| 5/4/2000 | | vice Filed by Respondent First Request for Production of |
| 5/25/00 | Acknowledgment of Receipt of Summons and Complaint by Anne F. Buta filed (s.d. 4/12/00) | |
| 5/25/00 | Acknowledgment of Receipt of Summons and Complaint by Joseph F. Nerges filed (s.d. 4/17/00) | |
| 5/25/00 | Acknowledgment of Receipt of Summons and Complaint by Robert S. McCulloch, III filed (s.d. 4/17/00) | |
| 5/26/00 | Affidavit of Service upon Jeff Kulick filed (s.d. 4/11/00) | |
| 6/5/00 | Notification of Discovery Service filed by Petitioner: Petitioner's Response to Respondent's First Request for Production of Documents. | |
| 7/28/00 | Motion to Require Posting of Security for Imposition of a Lien Pendente Lite filed by Joseph Nerges, Dissenting Shareholder. | |
| 7/28/00 | Memorandum of Law in Support of Motion for Posting Security filed by Dissenter Joseph Nerges. | |

Date Filed ___3/31/2000___ _____PENOBSCOT_____ Docket No. ___CV-2000-65___

10/30/00-JEFF KULICK DISMISSED  County

ASSIGNED TO JUSTICE JEFFREY L. HJELM

Action ___STATUTORY ACTION___

*Dismissed 10/30/00
*9/8/00 HENRY T. JACOBS DISMISSED

IN RE: VALUATION OF COMMON STOCK OF
       PENOBSCOT SHOE COMPANY                VS.

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| RUDMAN & WINCHELL<br>P O BOX 1401 - 84 Harlow Street<br>BANGOR ME 04402-1401<br>BY: Phillip Buckley, Esq.<br>　　 Anthony D. Pellegrini, Esq.<br><br>　　 CUDDY & LANHAM<br>　　 470 Evergreen Woods<br>　　 Bangor ME 04401<br>　　 BY: Samuel Lanham, Esq.<br>　　 FOR: Robert S. McCulloch, II and | Anne F. Buta, Pro se a/o 1/9/01 Samuel Lanham<br>663 S Lincoln Ave, Salem, OH 44460<br>Robert S. McCulloch, III, Pro se 1/9/01<br>335 N Union Ave, Salem OH 44460 Sam Lanham, E<br><br>Gilbert & Greif, P.A.<br>82 Columbia Street, PO Box 2339<br>Bangor, Maine  04402-2339<br>BY: Charles E. Gilbert III, Esq.<br>FOR: Respondent Joseph R. Nerges<br><br>Anne F. Buta |

| Date of Entry | |
|---|---|
| 3/31/00 | Complaint filed - Exhibit A attached. |
| 3/31/00 | Case File Notice Postcard forwarded to Plaintiff's counsel. |
| 4/21/00 | Answer to Complaint filed by Anne F. Buta, Pro se. |
| 4/21/00 | Answer to Complaint filed by Robert S. McCulloch, III, Pro se. |
| 5/4/2000 | Answer Filed by Respondent Joseph R. Nerges Filed. |
| 5/4/2000 | Notification of Discovery Service Filed by Respondent Joseph R. Nerges: Resondent's First Request for Production of Documents. |
| 5/25/00 | Acknowledgment of Receipt of Summons and Complaint by Anne F. Buta filed (s.d. 4/12/00) |
| 5/25/00 | Acknowledgment of Receipt of Summons and Complaint by Joseph F. Nerges filed (s.d. 4/17/00) |
| 5/25/00 | Acknowledgment of Receipt of Summons and Complaint by Robert S. McCulloch, III filed (s.d. 4/17/00) |
| 5/26/00 | Affidavit of Service upon Jeff Kulick filed (s.d. 4/11/00) |
| 6/5/00 | Notification of Discovery Service filed by Petitioner: Petitioner's Response to Respondent's First Request for Production of Documents. |
| 7/28/00 | Motion to Require Posting of Security for Imposition of a Lien Pendente Lite filed by Joseph Nerges, Dissenting Shareholder. |
| 7/28/00 | Memorandum of Law in Support of Motion for Posting  Security filed by Dissenter Joseph Nerges. |

STATE OF MAINE                                SUPERIOR COURT
PENOBSCOT, ss                                 CIVIL ACTION
                                              DOCKET NO. CV-00-65
                                              JLH - PEN - 6/2/2003

                                        )
IN RE: VALUATION OF COMMON              )     FILED & ENTERED
STOCK OF PENOBSCOT SHOE                 )     SUPERIOR COURT
COMPANY                                 )
                                        )     JUN 02 2003
                                        )
                                        )     PENOBSCOT COUNTY


## DISSENTING SHAREHOLDERS' RULE 60(a) MOTION
## TO ALTER OR AMEND TO CORRECT CLERICAL ERRORS


NOW COME The Dissenting Shareholders, Joseph Nerges, Robert McCulloch and Anne Buta, by and through their undersigned attorneys, and hereby move, pursuant to Rule 60(a) M.R.Civ.P., to correct two clerical errors in the Court's Decision and Judgment viz: the spelling of Dissenting Shareholder Robert McCulloch's name; and the correction of the typographical error in the judgment setting forth interest rate at 6% instead of 8%. The Rule provides that such errors can be corrected by the Court at any time and both are clearly simply typographical errors, not affecting the substance of the Court's opinion or decision.

For those reasons, the judgment should be altered and amended to set forth the correct spelling Dissenting Shareholder McCulloch, and also to set forth the correct interest rate in the judgment.


Date: 5-30-03

_____
Charles E. Gilbert III, Esq., BRN: 395
Gilbert & Greif, P.A.
82 Columbia Street P.O. Box 2339
Bangor, Maine 04402-2339
Attorney For Dissenting Shareholder Nerges


Date: 5-30-03

_____
Samuel W. Lanham, Jr., Esq.
Cuddy & Lanham
470 Evergreen Woods
Bangor, Maine 04401
Attorney For Dissenting Shareholders
McCulloch and Buta

## ORDER

Upon Motion made by the Dissenting Shareholders, pursuant to Rule 60(a) M.R.Civ.P., and for cause shown, the Court having made two clerical errors in its original Opinion and Judgment, it is ORDERED that the Court's Opinion and Judgment dated May 29, 2003 is hereby amended as follows:

1.  In all places, including the judgment, where the name of Dissenting Shareholder Robert McCullough appears, the spelling of his name shall be deemed corrected, and for all purposes shall be deemed as McCulloch;

2.  The judgment is corrected to reflect that the interest rate awarded to the Dissenting Shareholders as part of the Court's Decision, and as reflected in the written Opinion, is 8% not 6% and the Judgment shall be deemed amended accordingly. ✪

Date: _____6|4|03_____          _____
                                    Jeffrey Hjelm, Justice, Superior Court

✪ The erroneous reference to 6%, is in the docket entry. The substance of the order makes clear the court intent to allow interest at 8%.

JH

1648: F:\COMMON\NERGES\PLEADING\RULE60.WPD

2